NATIONAL LABOR RELATIONS BOARD v. CITIES SERVICE OIL CO. et al. (NATIONAL MARITIME UNION OF AMERICA, Intervener).

No. 340.

Circuit Court of Appeals, Second Circuit.

July 25, 1941.

Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, Sylvester Garrett, and Stanley D. Metzger, all of Washington, D. C., for petitioner National Labor Relations Board.

Frueauff, Burns & Ruch and Hatch & Wolfe, all of New York City (Carver W. Wolfe and Ross W. Lynn, both of New York City, of counsel), for respondent Cities Service Oil Co.

Albert E. Van Dusen, of New York City, for respondent Texas Co.

Kelly Bell, of Chicago, Ill., (Vinson, Elkins, Weems & Francis, of Houston, Tex., of counsel), for respondent Pure Oil Co.

William L. Standard, of New York City (Max Lustig and Edward J. Malament, both of New York City, on the brief), for intervener.

Before L. HAND, AUGUSTUS N. HAND, and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The National Labor Relations Board petitions this court to enforce orders that the respondents, Cities Service Oil Company, The Pure Oil Company and The Texas Company (1) cease and desist from refusing to grant passes to representatives of the National Maritime Union of America (hereafter called Union) in order that the latter may go aboard respondents' vessels and meet with the unlicensed personnel; (2) grant passes to such representatives, to be issued under such conditions and in such number as shall be determined by collective bargaining between each of the respondents and the Union.

Each of the respondents is engaged in the production, refining, marketing and transportation of petroleum and petroleum products and in the operation of a number of ocean-going oil tankers carrying petroleum and petroleum products between ports on the Gulf of Mexico and ports on the North Atlantic.

The complaints allege, and the respondents admit, that in June, 1938, and thereafter, the Union, which had been certified as the exclusive collective bargaining agent of the unlicensed personnel, sought and was refused passes for the purpose of going on board the tankers in order to investigate and negotiate concerning grievances of the seamen. The broad question is whether the refusal to grant the Union representatives access to the personnel restrained and coerced the latter in the exercise of rights guaranteed them by Section 7 of the National Labor Relations Act, 29 U.SC.A. § 157, thereby violating Section 8(1), 29 U.S.C.A. § 158(1).

After protracted hearings, the Board rendered a decision in which it summarized its conclusions as follows: "In conclusion, we find that seamen are in port for a short time with very little time ashore, and then only in small groups; that union halls are not readily accessible and shore delegates few in number with many duties; that seamen spend the few hours they have ashore in normal recreational pursuits; that grievances cannot adequately be settled by ships' committees because of the nature of the industry, the nature of the seamen, and the traditional subservience of the seamen to the masters; that grievances cannot be settled effectively ashore in the first instance owing to the impossible practical difficulties to the Union incident to such settlement; that grievance procedures which do not involve access are, in a practical sense, unworkable, and do not afford the seamen the opportunity to bargain collectively concerning their grievances; that the grievance procedure which involves access is prevalent today, and has long been in use, in the shipping industry; that access is common practice in land industries; that such procedure insures to the seamen the benefit gained from representation by expert, non-crew negotiators; that, with access, these representatives may learn the nature of, assess the value of, and properly present grievances on behalf of the seamen; that, without access, these representatives cannot effectively accomplish these important tasks; and that the grievance procedure which involves access is necessary for the protection of the right of the employees to bargain collectively through representatives of their own choosing as guaranteed in Section 7 of the Act. We find that all of the objections of the respondents to the granting by them of access are without merit."

We hold that the foregoing findings are supported by substantial evidence and that they, therefore, must be sustained. It may be added that the issues raised are of the sort where the exercise of administrative discretion seems the best way to solve difficulties. Indeed, except for a minor question affecting the form of the order, we can see no reason for burdening a court or the Board itself with a review of the enormous record before us. We are led to this conclusion not only by the logic of the situation, but because passes for ships have in the past been issued to representatives of labor unions without serious detriment to the employer and at times the practice has been very general.

Section 7 of the Act provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through

representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

Section 8 provides:

"It shall be an unfair labor practice for an employer—

"* * * To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [157 of this title]."

The result of refusing passes is undoubtedly to prevent the most effective sort of collective action by the employees. Ships, and particularly these oil tankers, which ordinarily remain in port for a day only, afford less opportunity for investigation of labor conditions than do factories where the employees go home every afternoon and have the evenings at their disposal. There is no cessation of work at the end of each day for seamen on a tanker. A large number of them are on watch, others are loading or discharging cargo; their hours for work and shore leave are different and, in the short time the vessel is in port, it is impossible for Union representatives to assemble the unlicensed personnel either on shore or on shipboard to discuss grievances or investigate conditions. The Union must have the members of the crew readily accessible in order to work to any real advantage and the complaints frequently relate to conditions on and even of the vessel itself.

It may be true that many, or even most, grievances are settled on the ship by the ship's committee without the intervention of the Union, but one of the prime objects of the Union is to afford the seamen advisors and negotiators who are not continually under the eye of the master and inclined through fear of untoward consequences to defer to his demands. Its advice as to major differences would naturally be needed and in many cases it cannot advise the personnel wisely without visiting the ship and seeing the conditions under which work is done and of which criticism is made.

Respondents suggest that the so-called ship's committee consisting of three members of the crew chosen by the seamen can present complaints to the ship's officers and if the grievances are not settled thus, can report in person or mail statements to the Union of matters in dispute which the Union may then take up with the respondents' shore officials. But negotiations conducted in such a way would be slow and the men would lack the advantage of having their bargaining agent promptly acquainted with grievances by the seamen themselves and ready at once to negotiate with the shore officials. Moreover, so far as possible the men themselves should have the privilege of airing their individual complaints to their representatives, just as do employees whose work is on land. The suggestion that the Union representatives can be stationed on the dock, there investigate complaints by meeting members of the crew as they come off the ship and after thus learning the facts from seamen can then bargain with respondents' shore officials, is subject to the objection that the dock is manifestly no place for an adequate discussion of labor grievances. Even if, despite the inconvenience, the men were able to visit Union headquarters for such discussion of their grievances, they would not have the presence and backing of experienced bargaining representatives when presenting their claims to the ships' officers. Nor under such restrictions can there be adequate discussion by the delegate with the ships' officers of matters requiring explanation.

The respondents say that bargaining representatives should be excluded from the ship because of the regulation of the Bureau of Marine Navigation prohibiting "visitors" from boarding vessels during transfers of inflammable cargo. There is no proof that the Bureau has ever construed bargaining agents as "visitors" or invoked the regulation to forbid their presence on ships, nor did the respondents rely on the regulation as a defense against the demand for passes at the time of the hearing.

The objection that the presence of Union representatives on the ship is likely to cause the men to leave their posts and to divert them from their work, to the danger of the ship and cargo, is not entirely unfounded. But their presence on the ship only involves a slightly greater danger of interference with the ship's business than would any mode of negotiation in which the attention of the men may be distracted from their work. Safeguards against interference with the vessels' operations have been worked out in other cases where passes have been allowed and, we believe, may readily be arranged here, if the employers are fair in affording opportunities

to present grievances through the Union and firm in requiring the men not to engage in activities affecting labor relations during their own working hours.

■ It may be argued that Section 8 of the Act forbids any interference whatever with the right of the employees to bargain collectively—in other words, that inconvenience and loss which may be occasioned to respondents by giving the Union representatives access to their ships has no bearing upon the rights of the seamen, which are guaranteed under Section 7. It would seem that a reasonable construction of the statute need not be as sweeping as this. Doubtless interference must not be so substantial as to preclude the reasonable exercise of the employees' rights but in determining what is a reasonable opportunity to bargain through chosen representatives we think the Board may weigh the inconvenience, risk or damage imposed upon the employer against any mere convenience to the Union of access to the vessel. The Board has done this and in our opinion reached a conclusion based upon substantial evidence.

■ There can, however, be no reason for giving the representatives of the Union passes in order that it may solicit new members or collect dues. Such activities were not shown by the Board to have been required "for the purpose of collective bargaining or other mutual aid or protection" even if they are guaranteed under Section 7 under some circumstances. The rights guaranteed by Section 7 primarily concern bargaining as to terms and conditions of employment and not the perpetuation of the tenure of any particular agent. Under 2 (a) of the order the conditions and the number of passes are to be determined by collective bargaining but at all events the employee should not be required to issue passes except subject to the condition that they will be forfeited if the holder shall use his access either to solicit union membership or to collect dues.

■■ The respondents make the further contention that the order of the Board is invalid because it unlawfully interferes with their property rights in contravention of the Fifth Amendment of the Constitution of the United States by compelling them to part with the complete control of their vessels. Such an argument, if applied generally, would invalidate the Multiple Dwellings Law of New York, Consol.Laws, c. 61-a, § 1 et seq., the statutes securing tenants in times of financial depression against disturbance in the possession of their leaseholds when the terms have expired. It is not every interference with property rights that is within the Fifth Amendment and we see no basis for invoking the Constitution in the present situation. The National Labor Relations Act is based largely upon a conception of the right to collective bargaining as the solvent of all industrial ills. Inconvenience, or even some dislocation of property rights, may be necessary in order to safeguard the right to collective bargaining.

■ Under the recent decision in National Labor Relations Board v. Express Publishing Co., 61 S.Ct. 693, 85 L.Ed. 930, 1 (b) of the order of the Board should be eliminated. After requiring the respondents to cease and desist from refusing to grant passes the order adds in subdivision (b) that they cease and desist from: "In any other manner interfering with, restraining or coercing their employees". There was no proof before the Board of a general plan to interfere with employees but simply of refusal to grant passes to representatives of the Union to go aboard respondents' vessels to meet with the unlicensed personnel thereon. There was also no indication that the employees will commit this or any other unfair labor practice hereafter. This was merely a test case to raise a single point. Accordingly 1(b) should not stand and enforcement thereof should not be granted.

The petition to enforce the order of the Board is granted except in respect to 1 (b), as to which it is denied, and in respect to 2(a), as to which it is granted as modified by the addition of the following clause: "But such passes are not required to be issued without a provision therein that they shall be forfeited if the holder uses his access to the vessels either to solicit membership in the Union or to collect dues."