## RICHFIELD OIL CORPORATION v. NATIONAL LABOR RELATIONS BOARD.

### No. 10437.

Circuit Court of Appeals, Ninth Circuit.

June 30, 1944.

Concurring Opinion July 19, 1944.

David Guntert, of Los Angeles, Cal., for petitioner.

Robert B. Watts, Gen. Counsel, Howard Lichtenstein, William Scharnikow, Roman Beck, and Isadore Greenberg, Attys. National Labor Relations Board, all of Washington, D. C., for respondent.

Before DENMAN, MATHEWS, and STEPHENS, Circuit Judges.

DENMAN, Circuit Judge.

This case is before us upon the petition of Richfield Oil Corporation to review and set aside an order of the National Labor Relations Board issued against petitioner pursuant to Section 10(c) of the National Labor Relations Act, 49 Stat. 449, U.S.C., 1940 Ed., Title 29, Sec. 151 et seq., 29 U.S. C.A. § 151 et seq., hereinafter called the Act. In its answer to the petition the Board requests that its order be enforced. The jurisdiction of this court is based upon Section 10(e) and (f) of the Act; petitioner, a Delaware corporation, has its principal place of business at Los Angeles, California, and transacts business within this judicial circuit.

The Board's order directed petitioner to allow representatives of the Unions,[1] certified as the exclusive bargaining representatives of the unlicensed personnel in the deck and engineroom departments of petitioner's tankers, to board its vessels so that they may investigate and present grievances in behalf of the employees whom the Unions represent, collect union dues, and distribute the Unions' newspaper among the union members. The order explicitly declares, however, that petitioner need not allow the union representatives to solicit membership on board its vessels.

Petitioner is engaged in producing, refining, marketing and transporting petroleum and petroleum products. The employees to whom this proceeding relates are seamen whom petitioner employs in the operation of its ocean-going oil tankers, which ply among the Pacific Coast ports and offshore. No question of jurisdiction is presented; petitioner concedes that it is subject to the Act.

The Board found that, although the Unions were such bargaining representatives, petitioner has refused and is refusing to allow their representatives to board its vessels while the vessels are in port for the purpose of conferring with the seamen whom the Unions represent, of negotiating with the ships' officers concerning their grievances and of performing other services in their behalf; petitioner, by this conduct, has interfered and is interfering with its employees' exercise of their right to engage in concerted activity for the purposes of collective bargaining or other mutual aid or protection, in violation of Section 8(1) of the Act.

Their vessel is at once the residence and place of work of the sailors. As their residence there has been a gradual evolution from the dimly lit and unventilated forecastle with its tiers of bunks, lack of privacy and disease-communicating crowding into a trailing approximation of the rising standards of workmen ashore. Likewise a trailing rise towards onshore fare in ships' food and its preparation from the salt horse and not infrequently weevilly hardtack, with the accompanying scurvy, to a more diversified diet with cooks of better training and skill. The competition of the vessels in sea carriage has been so keen, the profits often so slender or absent, that many managers have not had the means for voluntary improvement of the sailors' quarters or food. The pressure of the sailors' unions and particularly the Sailors Union of the Pacific under the historic leadership of Andrew Furuseth has been a major factor in this gradual evolving improvement. Constant vigilance and pressure is required to prevent a falling below any established standard or failure to improve conditions as the standard continues its certain rise.

It is obvious that the shore representatives of the Unions, known as the "patrolmen" or "shore delegates," best may present to the petitioning owners of the fleet of tankers any grievance regarding food or the physical condition in their living quarters or stations where the sailors work, if the delegates have themselves inspected the vessel with regard to the matters of which complaint is made.

We agree with the Board that because "[petitioner's] unlicensed deck and engine personnel are in port for a short time with very little time ashore; that tanker terminals are usually located in port areas inaccessible to union headquarters" the elected union leaders of the several tankers' personnel cannot as effectively bargain with the owner as to such grievances as the shore delegates. Hence we hold that it was within the Board's power to determine that the delegates' access to the tankers while in port is a necessary incident of the sailors' right of collective bargaining conferred by Section 8(1) of the Act; and that the passes, which former-

---

[1] Sailors Union of the Pacific, a division of Seafarers' International Union of North America, and Seafarers' International Union of North America, both affiliated with the American Federation of Labor.

ly gave these delegates such access, properly were ordered by the Board to be issued to them by the petitioning owner. Cf. National Labor Relations Board v. Cities Service Oil Co., 2 Cir., 122 F.2d 149.

The answer of the petitioning owner admits the violation of this continuing right of their sailors, in that "while engaged in the course and conduct of its business, * * * on or about October 1942, [it] did refuse, and at all times since that date has refused, to permit duly authorized representatives of Sailors Union, and duly authorized representatives of Seafarers Engine Division to go aboard the Respondent's Pacific Coast oil tankers, * * *."

The right to such access through passes issued by the petitioner had been recognized in a prior contract with the sailors. The passes were denied on the expiration of that contract.

■ The petitioner seeks to excuse this denial of the sailors' right on the ground that it is one which they may bargain away and therefore one which the employer may withhold from the sailors during the period of their collective bargaining for a new contract—in this case a bargaining for such a contract being under way during the period of the denial of the right.

There is no merit in this contention. Assuming, but not deciding, that the sailors may bargain away the right of access of their shore delegates, in the absence of such an agreement the right exists and is enforcible. The owner cannot deny its exercise for the purpose of making a better bargain as to some other provision of the contract.

■ In addition to its attempted justification of the denial to the shore delegates of passes giving access to the vessels, because aiding it in making a bargain, the owner claims that it had the right to refuse such access to the shore delegates because during this war with the Axis powers the delegate, or a pretended delegate, may be a spy or saboteur of the enemy. This refusal of access to the delegates, it is claimed, is merely an incident of the exclusion from the vessels of all persons not in the owner's employ.

The evidence shows the claim untrue. As found by the Board, the owner "has not seen fit to exclude laundry agents, extra-work parties, not members of the crew and in most instances [casual labor] 'picked up'

[in the port area]." The agencies of the government charged with responsibility for the safety of our shipping have not excluded union representatives from piers, dock, and ships. Moreover, as the Board found, "it is the almost universal practice of the shipping industry on the West Coast to grant access to the duly authorized representatives of their seamen, whether or not such right is provided for in collective bargaining contracts." In view of these facts, the Board was fully justified in finding that to compel petitioner to allow representatives of the Unions to board its vessels would not "require any conduct which is in derogation of [war-time safety regulations], or which would endanger the safety of the [petitioner's] vessels, or adversely affect discipline on board these vessels."

■ We do not find that there was any general attitude or conduct on the owner's part to violate the provisions of the Act. There was a mistake of law in its assumption that the right to such access and the passes facilitating it was one acquired by bargaining instead of by the Act itself. We hence decline to decree the enforcement of the omnibus cease and desist of clause (b) of the Board's order. Otherwise we sustain the Board and we decree that the petitioner Richfield Oil Corporation

1. Cease and desist from:

(a) Refusing to grant passes to representatives of the Sailors Union of the Pacific, a division of Seafarers' International Union of North America, and Seafarers' International Engine Division, a division of Seafarers' International Union of North America, in order that such representatives may go aboard the petitioner's vessels for the purpose of collective bargaining, for the discussion and presentation of grievances, and for other mutual aid and protection of the employees represented by these Unions, including the collection of dues and distribution of trade papers to union members, provided, however, that the petitioner is not required to issue passes for the solicitation of membership.

2. Take the following affirmative action which will effectuate the policies of the Act:

(a) Grant passes to the duly authorized representatives of the Sailors Union of the Pacific, a division of Seafarers' International Union of North America, and Seafarers' International Engine Division, a division of Seafarers' International Union

of North America, to go aboard its vessels for the purposes of collective bargaining, for the discussion and presentation of grievances, and for other mutual aid and protection of the employees represented by the Unions, including the collection of dues and distribution of trade papers to union members, provided, however, that the petitioner is not required to issue passes for the solicitation of membership;

(b) Post immediately in conspicuous places on its vessels, for a period of at least sixty (60) consecutive days from the date of posting, notices to the unlicensed deck and engine personnel, stating: (1) that the petitioner will not engage in the conduct from which it is ordered to cease and desist in pargaraph 1(a); (2) that the petitioner will take the affirmative action set forth in paragraph 2(a) hereof;

(c) Notify the Regional Director for the Twenty-first Region in writing within ten (10) days from the date of this decree what steps the petitioner has taken to comply herewith.

MATHEWS, Circuit Judge (concurring in the result).

I concur in the result, but do not concur in all that my associates (Judges DENMAN and STEPHENS) say in their opinion. My associates say:

"Their vessel is at once the residence and place of work of the sailors. As their residence there has been a gradual evolution from the dimly lit and unventilated forecastle with its tiers of bunks, lack of privacy and disease-communicating crowding into a trailing approximation of the rising standards of workmen ashore. Likewise a trailing rise towards onshore fare in ships' food and its preparation from the salt horse and not infrequently weevily hardtack, with the accompanying scurvy, to a more diversified diet with cooks of better training and skill. The competition of the vessels in sea carriage has been so keen, the profits often so slender or absent, that many managers have not had the means for voluntary improvement of the sailors' quarters or food. The pressure of the sailors' unions and particularly the Sailors Union of the Pacific under the historic leadership of Andrew Furuseth has been a major factor in this gradual evolving improvement. Constant vigilance and pressure is required to prevent a falling below any established standard or failure to im-

prove conditions as the standard continues its certain rise."

These statements have no basis in the record. The matters stated are not known judicially and, if true, are, for present purposes, irrelevant. As to their truth or falsity, I express no opinion.