## NATIONAL LABOR RELATIONS BOARD v. SUN TENT–LUEBBERT CO. et al.

### No. 10533.

Circuit Court of Appeals, Ninth Circuit.

Aug. 30, 1945.

Rehearing Denied Dec. 28, 1945.

STEPHENS, Circuit Judge, dissenting in part.

------◆------

Alvin J. Rockwell, Gen. Counsel, N.L.R.B., Malcolm F. Halliday, Associate Gen. Counsel, Frank Donner, William J. Is-aacson, and Joseph Robison, all of Washington, D. C., for petitioner.

Harry William Elliott and C. R. Leslie, both of Los Angeles, Cal., for respondent Merchants & Manufacturers Ass'n. ·

Rosecrans & Emme, of Los Angeles, Cal., for Los Angeles Central Labor Council, amicus curiae.

Before DENMAN, STEPHENS, and BONE, Circuit Judges.

DENMAN, Circuit Judge.

The National Labor Relations Board here seeks enforcement of separate orders issued by it pursuant to Section 10 of the National Labor Relations Act, 29 U.S.C.A. § 160, against the numerous respondents. The unfair labor practices found to exist were those specified in Sections 8(1) and 8(2) of the Act, 29 U.S.C.A. § 158(1, 2).[1] More specifically, the Board found that all of the respondents, acting in concert, dominated and interfered with the formation and administration of the Independent Canvas Workers Union, Inc., hereinafter called the Independent, a labor organization of the employees of the canvas manufacturing respondents, and contributed to its support.

Enforcement of the Board's orders is opposed by but one respondent, Merchants and Manufacturers Association of Los Angeles, hereinafter referred to as M & M. M & M is a nonprofit California corporation composed of employers. It was incorporated in 1896 "to promote the business interests of Los Angeles City and County and the country tributary thereto." Membership in it is open to "any person, firm, association, or corporation doing a merchandising, manufacturing, banking, professional or other business requiring employment of unskilled, skilled or professional labor." The dues of regular members are calculated upon the basis of 50 cents per year per employee, with a minimum of $24 per year.

Other respondents include four companies engaged in the fabrication, sale and distribution of canvas products. These are the Sun Tent-Luebbert Company, Mellus

---

[1] "Sec. 8. It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7.

"(2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it * * *".

Section 7 of the Act, 29 U.S.C.A. § 157 provides

"Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

Brothers & Company, Inc., Downie Brothers, Inc., and United Tent and Awning Company, Ltd.

Besides M & M, there are two other institutional respondents. Southern Californians, Inc., hereinafter referred to as SCI, is a nonprofit California corporation formed in October of 1937 in order, according to its articles of incorporation, to promote, among other things, business and trade in Southern California by such means as might serve to attract new business enterprises, and to cooperate with and to finance to the extent deemed proper social and economic movements. Institutional memberships, open to employers, provide for dues payments calculated at 50 cents per month per employee of such member. Individual memberships requiring initiation fees of $100 were also available. SCI had 50 individual members and 440 institutional members. Included in its membership rolls were many large employers in almost every line of business endeavor. Among the SCI organizers were the president, general manager and several directors of M & M.

The Board was entitled to infer from the fact that the lifeblood of M & M and SCI was their funds from dues based upon the numbers of employees rather than industrial income, that they were employer organizations concerned with the relations of employer and employee. There were continuing interlocking directors in M & M and SCI. M & M's president stated at a director's meeting on October 28, 1937, that SCI "has recently been set up to act in the capacity of a Community Chest for labor problems, and to coordinate the efforts of all existing employer groups. It will assist the Merchants and Manufacturers Association and certain funds will be turned over to the Merchants and Manufacturers. The new organization will augment our efforts not supplant them."

The Neutral Thousands, hereinafter referred to as TNT, a nonprofit California corporation, was incorporated almost simultaneously with SCI in October 1937 for "educational purposes." Membership, involving no dues payment, was open only to women and entailed the obligation of support by women to the high-sounding "Industrial Peace Crusade of The Neutral Thousands to safeguard the welfare of California women and children and to protect the American home." TNT's womanly (sic) activities, later considered, were sup-

ported by SCI which contributed in excess of $87,000 to TNT between November 17, 1937, and March 15, 1939.

The TNT's method of protecting the American home was by the employment of two agents, Rittenhouse and Huff, to form company dominated unions in violation of the Act. M & M's manager, Fysh, previously had used Rittenhouse and Huff in the labor relations activities of M & M. They had successfully organized, with the employer's aid, a company dominated union in the Firestone Tire & Rubber Company, and then were engaged in organizing a league of so-called independent unions.

After preliminary discussion with Rittenhouse, in which Fysh promised him assistance in the work he might undertake in helping organize "independent" unions, Fysh on at least four occasions sought Rittenhouse's aid in plants where there was current labor activity—abandonment of an "independent" union, a strike, or an organizational campaign by an outside union. It was the practice of Fysh to support and direct Rittenhouse's activities by furnishing him with names of selected employees and employer representatives who would assist in the effort to bring the desired organization into existence. Twice Rittenhouse succeeded in his attempts. After this illicit relationship with M & M we find Rittenhouse and Huff performing similar employee services for TNT.

The Employees Advisory Service was a partnership formed in April of 1939, immediately after TNT became quiescent, to carry on certain work previously done by the latter organization. The partners were Rittenhouse and Huff, the former employees of TNT. The evidence supports the Board's finding that they violated the Act.

M & M does not question the interstate character of the canvas companies' business as conferring jurisdiction on the Board nor the Board's holding that it violated the National Labor Relations Act. The facts amply support the Board's jurisdiction.

█ The argument of M & M, applicable also to the other institutional respondents, is that they are not employers engaged in interstate commerce. There is no merit in this contention. All the functions performed by the agents of the institutional defendants were employer functions. The employer institution acts when its agent acts. When an industry engaged in inter-

state commerce utilizes the institutional agents to interfere with interstate commerce, the institutions, as agents of the interstate employer, violate the Act. Such agents as Rittenhouse and Huff were discharging employer functions in their labor organizing efforts, though pretending to be acting on behalf of the workmen.

Were this not obvious, the three institutions are employers within the definition of Section 2(2) of the Act, 29 U.S.C.A. § 152(2), providing, in its relevant portion, that "The term 'employer' includes any person acting in the interest of an employer, directly or indirectly." Section 2(1) of the Act provides specifically that "The term 'person' includes one or more * * * associations * * *".

In the Fall of 1937, the Textile Workers Union of America, Local No. 99, affiliated with the C.I.O., and the Upholsterers International Union of North America, Local No. 15, affiliated with the A.F. of L., were conducting active and sustained campaigns to organize the employees of the canvas companies. The canvas companies were well aware of this progress. They all, save Mellus Brothers & Company, which was already a member, joined M & M in order, according to Robert C. Downie, secretary of Downie Brothers, Inc., "to give them financial support in the effort they were putting forth to keep Los Angeles an open shop town."

At nearly the same time, M & M's counsellor, Ryerson, called upon Rittenhouse and Huff of TNT, telling them that he wished them, if it was possible, to set up an independent union covering the entire canvas industry.

Armed by Ryerson with lists of prospectively cooperative employees, including supervisory employees, at the various plants, and the promise of further assistance by Ryerson, Rittenhouse and Huff discussed the TNT plans of union control with E. C. Everson, plant superintendent for Mellus Brothers. With his aid and cooperation, Rittenhouse and Huff put on a rapid-fire

campaign which very shortly resulted in the formation of the sought for corporate Independent. This process was generously aided by grants of company time and use of company property. Supervisory employees, in some cases of high standing, led the campaigns for membership—sometimes by the use of threats of loss of jobs for those who were uncooperative. Also such supervisory employees made direct financial contributions to Independent. Huff was made business agent of the now incorporated Independent; he drafted an agreement and engineered its acceptance by the companies, though it does not appear that the approval of the membership of the Independent was sought or required.

The contract gained the employees few benefits. After its acceptance, Huff assumed, this also without employee approval, the additional and inconsistent role of independent arbiter of disputes between employer and union. Thereafter he took single-handed control of the administration of the union, as well as conduct of the social and recreational activities that were planned, not by Independent but by TNT.

We thus have evidence from which the Board could infer that M & M, through its corporate agent Ryerson, conspired with TNT, the agency of SCI, to violate the National Labor Relations Act by the formation of an employer dominated union in the canvas industry. That is to say, the conspiracy was of the canvas companies as employer principals and the institutional association as their employer agents.[2]

The evidence is clear from which the Board could infer that counsellor Ryerson was not only acting within the scope of his authority as one of M & M's industrial relations staff, but that he was performing an authorized and expected counselling function in so conspiring to violate the Act.

The executive committee of M & M in reorganizing that association after the enactment of the National Labor Relations Act, declared among its objectives the violation of the Act. It stated, "The em-

---

[2] There were other occasions in which M & M employees gave aid and direction to Rittenhouse and Huff in the carrying out of the plan for the mass production of company unions. For example, Rittenhouse testified that Ryerson instigated and assisted TNT efforts to establish such unions at the Padre Vineyards and the National Venetian Blind Company. With respect to the first mentioned firm the attempt was successful. Nor was counselor Ryerson the only M & M employee so collaborating with TNT. There is testimony that his immediate superior, George Smith, head of the industrial relations department, engaged in a similar course of counseling cooperation with Rittenhouse with regard to at least two other plants, and attained a measure of success.

ployer will have to be convinced of the necessity and benefits of bargaining collectively with his own employees, that is, the desirability of training his employees to deal with him directly rather than through an outside labor organization. Our contacts so far have indicated that many employers have not the slightest conception of how this result can be obtained. Advice, counsel, and assistance in the attainment of this objective will have to be given over a long period of time."

In accomplishing this illegal purpose of *training* employees not to join an outside labor organization, the minutes of a succeeding M & M board meeting describe their activities as "a fight against union labor."

In the conspiracy to violate the Act the M & M agents caused the incorporation of many industrial trade associations. In the case of the garment industry the incorporating officers were of M & M's staff and the work of incorporation done by the attorney Leslie, M & M's legislative counsel.

The employer members of the associations so formed by M & M entered into illegal contracts, the forms of which were furnished by M & M, binding themselves not to "enter into any agreement either oral, written or implied, with any labor organization," to "deal directly with its own employees" and not to "recognize or deal with any person or persons not on the Company pay roll in matters of individual or collective bargaining." In some or all of these contracts a penalty of $10,-000 or more was provided for violation of such provisions.

Incidentally, this means that while M & M's corporate associations were advised by M & M to engage the bargaining services of such efficient members of the bar as attorneys Neary, Watkins, Howlett and others for their anti-union activities, the worker employees not only could not employ experienced labor organizers, but could not even organize. All this under the slogan of protecting the worker in his job.

The evidence shows trade associations with such contracts were established in the cabinet and fixture, neon sign manufacturing, upholstering and garment industries. M & M sought such so-called open shop organization of all the industries in Southern California, whether or not they were among its members. The Board's examination did not extend beyond the four above.

In the instant case of the canvas workers organized under the counselling of Ryerson and under the *"open* shop" slogan, every employee of the industry was compelled to join the "Independent." Thus was created an employers' *"closed* shop" in an alleged open shop campaign.

Despite this, such illegal agreements made to carry out M & M's program of *"training* * * * employees to deal with [the employer] directly rather than through an outside labor organization" are described by M & M's manager Fysh as maintaining the "open shop."

M & M attempts to argue that its many years advocacy throughout Southern California of the "open shop" was for no more than to give to the American non-union workman a job—that is to protect a civil liberty which it claimed to be of profound value. It also claims that all that was publicized and counselled was but an exercise of its constitutional right of "free speech."

In view of what M & M actually did under these euphemistic slogans, the Board well could infer them to be insincere protestations to conceal their conspiracy to form company dominated unions by the utilization of the organization of women, many of whom, no doubt, innocently believed they were "protecting the American home."

It is thus clear that the Board was entitled to find that counselor Ryerson who, in some of the scores of his daily conferences with TNT'S Rittenhouse and Huff, advised the formation of the canvas employers' Independent, was acting within the scope of his counselling authority, and was doing exactly what his principal, M & M, expected him to do.

Manager Fysh testified that when he learned of one of Ryerson's conferences with Rittenhouse and Huff, he ordered Ryerson not to counsel them further. He sought to create the impression that counselor Ryerson's successive scores of daily conferences with the agents of TNT in the formation of company dominated unions constituted but a frolic of his own. The trial examiner who heard Fysh's testimony and commented upon his demeanor refused to believe him as did the Board. Fysh fully realized that what Rittenhouse and Huff were doing, along with a TNT woman organizer, Mrs. Ochs, was employer union organizing and not union organization through the free action of employees. His claimed but not believed further instruction to counselor Ryerson not to "con-

tact" *employees* was not an instruction not to counsel such *employer* agents.

While Ryerson was giving his daily counselling to the TNT agents and after the organization, with Ryerson's aid, of Independent on December 8, 1937, SCI, the supporter of TNT, began in March 1938 a $2,000 a month contribution to M & M to enlarge M & M's industrial relations staff, of which Ryerson was a counselor member. M & M's budget for the expenditure of these moneys was submitted to SCI for approval. Also, on January 19, 1938, SCI adopted a resolution permitting members of M & M who were prospective members of both organizations, but who were unable to pay the dues of both, to be relieved of one month's dues to SCI.

With this background of M & M's illegal purpose, intent and accomplishment the Board was warranted in inferring that all of M & M's extended labor activities in Southern California in the years since the passage of the National Labor Relations Act, in which it expended large sums of money, were infected with a like illegality.

Among the principal M & M activities after the passage of the Act in 1935 were the formation and administration of its free employment bureau and its strike breaking service. Between March 19, 1936, and December 31, 1937, M & M's free employment bureau registered 6617 prospective employees, of whom 4098 were placed, many in plants in which there were pending strikes. The Board was entitled to infer that these men were subject to the M & M "training" not to become members of unions free of company domination.

For the claimed guarding of such plants, guards and detectives were furnished by M & M. In this period M & M paid to Bodell's Detective Agency for such services [3] "some such sum" as $91,000 according to the testimony of M & M's attorney Leslie, the advisor of M & M's industrial relations bureau so subsidized by SCI.

Whether such a labor employment bureau and such use of detectives and their employees in strike breaking activities in themselves could have been conducted without violation of the Act is not a matter of our concern. The sole question we decide is that in view of the evidence of other contemporaneous *illegal* anti-labor activities, the Board could infer that they were but part of a broad and long continuing conspiracy to frustrate and thus violate the National Labor Relations Act.

■ M & M complains that certain irrelevant and incompetent facts and hearsay were admitted in evidence in the hearings. Ample evidence remains to support the Board's findings respecting the broad area of M & M's subversive activities and consequent area of the cease and desist order, were such facts excluded. Such administrative hearings are not governed by the "rules of evidence prevailing in courts of law or equity." 29 U.S.C. § 160 (b), 29 U.S.C.A. § 160 (b). "The obvious purpose of this and similar provisions is to free administrative boards from the compulsion of technical rules so that the mere admission of matter which would be deemed incompetent in judicial proceedings would not invalidate the administrative order." Consolidated Edison Co. v. National Labor Relations Board, supra, 305 U.S. 229, 230, 59 S.Ct. 217, 83 L.Ed. 126.

■ M & M contends that we should not order enforcement of the Board's order because of the lapse of time since the charge of the subversive acts. So far as concerns the period between the entry of the order on November 29, 1941, and the filing of the Board's petition for enforcement in this court, M & M at any time could have petitioned to have it set aside. 29 U.S.C. § 160 (f), 29 U.S.C.A. § 160(f). Instead, it remained quiescent. Concerning the period of pendency of the proceeding before the Board, the record of 21 printed volumes, containing upwards of 10,000 pages, shows the great amount of time-consuming work for its comprehension and consideration of counsel of all the parties, of the trial examiner, and finally of the Board. Extensions of time for the production of evidence and for briefing were sought and procured by M & M, other parties, and the Board. We see no merit in the contention that the Board's order should not be enforced because of laches, if that ever be a ground of refusal to enforce. The motion to dismiss on this ground is denied.

■ M & M contends that section 3 of the desist order is too broad because restraining similar acts of the institutional defendants with employers other than the Sun Tent-Luebbert Co. and other canvas companies. On the evidence the Board found:

"The unfair labor practices committed by the respondents with respect to the employees of the canvas companies were in fact executed as an integral part of a coordinated scheme or plan designed by the institutional respondents as a means of assist-

[3] Cf. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 230, 59 S.Ct. 206, 83 L.Ed. 126.

ing all employers of Southern California in interfering with, restraining, and coercing their employees in the exercise of the rights guaranteed to such employees under the Act. Such coordinated plan, if again applied, will inevitably bring about a further concerted violation of the Act, similar in kind to the unfair labor practices found. Since the institutional respondents have publicly and persistently invited all employers of Southern California to enlist their services in introducing such plan among their employees, it is reasonable to assume, and we find, that the institutional respondents are fully equipped for, and ready to proceed with, the commission of similar unfair labor practices with respect to the employees of other employers, unless ordered to refrain from so doing."

The case is obviously different from Richfield Oil Corporation v. National Labor Relations Board, 9 Cir., 143 F.2d 860, 862, where we said

"We do not find that there was any general attitude or conduct on the owner's part to violate the provisions of the Act. There was a mistake of law in its assumption that the right to such access and the passes facilitating it was one acquired by bargaining instead of by the Act itself. We hence decline to decree the enforcement of the omnibus cease and desist clause (b) of the Board's order * * *".

We think the finding justified. The Board's order is a matter within its informed discretion. Phelps Dodge Corporation v. National Labor Relations Board, 313 U.S. 177, 193, 195, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217. In exercising that discretion the Supreme Court advises that "It is a salutary principle that when one has been found to have committed acts in violation of a law he may be restrained from committing other related unlawful acts." National Labor Relations Board v. Express Publishing Co., 312 U.S. 426, 436, 61 S.Ct. 693, 699, 85 L.Ed. 930.

The order here restraining future violations as to other employers is justified because, in the language of the Express Publishing case, 312 U.S. at page 437, 61 S.Ct. at page 700, 85 L.Ed. 930, it appears that the "danger of their commission in the future is to be anticipated from the course of [M & M's] conduct in the past."

Here there was a general attitude and conduct which the Board could infer evidenced an intent to nullify the National Labor Relations Act for all employers and employees in Southern California. We believe the purposes of the Act will be accomplished as to the institutional respondents by modifying the order by striking out sentences (2) and (3) of paragraph a of section 3 of the order.

A decree of enforcement of the entire order of the Board, modified as above, shall be entered.

STEPHENS, Circuit Judge (concurring in the result and dissenting).

Stripped of argument and characterization of evidence, I accept the clear and comprehensive statement of facts as they are set out in the majority opinion.

It should be understood that although the Board's order is directed to other respondents, its enforcement through the order of this court is opposed here by M & M only.

I am in full agreement with my associates in the order agreed upon by them insofar as it relates to the other respondents in the case and concur therein, but I dissent to the application of the order to persons and organizations not parties in the case.

The M & M is not an employer but is in the case by reason of its relation to the other named parties in respect of their labor relations. It was amply proved that M & M was actively promoting its general plan of labor relations as it applied to all Southern California and was cooperating with the named respondents in its interest. See National Labor Relations Board v. J. G. Boswell Co., 9 Cir., 1943, 136 F.2d 585, 594.

The plan is unquestionably inconsistent with the Labor Act, and the practice under it, as related to the respondents, is illegal.

The Board in its Findings of Fact says: "Since the institutional respondents have publicly and persistently invited all employers of Southern California to enlist their services in introducing such plan among their employees, it is reasonable to assume, and we find, that the institutional respondents are fully equipped for, and ready to proceed with, the commission of similar unfair labor practices with respect to the employees of other employers, unless ordered to refrain from so doing. We, therefore, deem it necessary to prevent the commission of such similar unfair labor practices by the institutional respondents, acting in the interest of other employers, and we shall, accordingly, order such respondents to cease and desist from in any

other manner, severally, jointly, or in concert with other employers, interfering with the rights guaranteed to employees in Section 7 of the Act."

It is the part of the Board's order which responds to the quoted language of the Board that I think is beyond the power of the Board. It unreasonably extends the power of injunction and effectively approves the future summary trial of facts by the Circuit Court of Appeals by way of contempt proceedings in cases which never have been and never will be before the National Labor Relations Board. It makes the Circuit of Appeals a labor court of the first instance instead of a reviewing court. I think all of this is far beyond the congressional intent in enacting the National Labor Relations Act.

The only authority suggested by the Board and by the majority in this court is National Labor Relations Board v. Express Publishing Co., 1941, 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930. Nothing remotely like this was before the court in that case, and nothing said in the Supreme Court's opinion has the slightest application to such a situation. The Board's cease and desist order in the cited case was directed to the respondent, Express Publishing Co., in relation to its treatment of its own employees. Sentences, general in nature, torn from their context in the Supreme Court's opinion cannot serve as authority for a proposition not in the case. For this court's analysis of the Express Publishing Co. case see National Labor Relations Board v. Pacific Gas & Electric Co., 1941, 118 F.2d 780, 789, as set out in the majority's concurring opinions.

Upon Petition for Rehearing.

PER CURIAM.

The matter quoted on page 10 of our printed opinion, 151 F.2d 489, shows a "clear determination by the Board of an attitude of opposition to the purposes of the Act to protect the rights of employees generally." May Department Stores Co. v. National Labor Relations Board, —— U.S. ——, 66 S.Ct. 203, 211, 213; Idaho Potato Growers v. National Labor Relations Board, 9 Cir., 144 F.2d 295, 311, par. 2(a).

The petition of respondent for rehearing is denied.

STEPHENS, Circuit Judge, is of the opinion that the petition for rehearing should be granted on the question of the extent of the cease and desist order.