253 F.2d 66
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
NATIONAL ORGANIZATION MASTERS, MATES AND PILOTS OF AMERICA, Inc., AFL-CIO; and National Marine Engineers Beneficial Association, AFL-CIO; and National Maritime Union of America, AFL-CIO; and Rivers Joint Organizing Committee; and their agent Gordon C. Knapp, Respondents.
 No. 12103.
 United States Court of Appeals Seventh Circuit.
 March 4, 1958.
 
 Stephen Leonard, Associate General Counsel, Fannie M. Boyls, Jerome D. Fenton, General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Washington, D. C., Robert J. Wilson, Attorneys, National Labor Relations Board, Washington, D. C., for petitioner.
 W. Munro Roberts, Jr., St. Louis, Mo., for amicus curiae.
 William J. Costello, St. Louis, Mo., H. Howard Ostrin, Cooper, Ostrin & De Varco, New York City, Herman E. Cooper, Eugene N. Sosnoff, New York City, of counsel, for National Maritime Union of America, AFL-CIO.
 Before DUFFY, Chief Judge, and FINNEGAN and PARKINSON, Circuit Judges.
 DUFFY, Chief Judge.
 
 
 1
 The National Labor Relations Board petitions for enforcement of its order issued on December 18, 1956 against respondents National Organization Masters, Mates and Pilots of America, Inc., AFL-CIO; National Marine Engineers Beneficial Association, AFL-CIO; National Maritime Union of America, AFL-CIO; Rivers Joint Organizing Committee and their agent, Gordon C. Knapp. The Board's decision and order is reported at 116 N.L.R.B. 1787. The alleged unfair labor practices occurred near Cairo, Illinois, within this judicial circuit. The employers are J. W. Banta Towing Co., Inc. and Plaquemine Towing Corporation. Capt. J. W. Banta is the president and principal stockholder of each corporation. The companies will be hereinafter called the Employer. Capt. Burt Banta was the Master of the tug Kishwaukee. For convenience, we shall sometimes refer to the Bantas as Capt. J. W. and Capt. Burt.
 
 
 2
 Respondent Rivers Joint Organizing Committee was formed on August 4, 1954, for the purpose of facilitating the organizing of the crews of towboat companies operating on the Mississippi River and other inland waterways of the United States. This Committee was formed and its policies are controlled by respondents National Organization Masters, Mates and Pilots of America, Inc., AFL-CIO, National Marine Engineers Beneficial Association AFL-CIO, and National Maritime Union of America, AFL-CIO. Respondent Gordon C. Knapp is an organizer representing the Rivers Joint Organizing Committee, and is paid by the National Maritime Union.
 
 
 3
 In late September or early October, 1954, Capt. J. W. Banta boarded the tug Kishwaukee for a few days. He asked Leuchtmann, a member of the crew, if any Union representatives had ever attempted to speak to him aboard the Kishwaukee. Receiving a negative answer, Captain J. W. said that if he ever heard that "union people were aboard his boat" he would fire them. He said he didn't want "no damn unions on his boat."
 
 
 4
 On September 23, 1954, two crew members of the Kishwaukee, "Curly" O'Laughlin, then the Chief Engineer, and Leuchtmann, his helper, wrote to the respondent Unions requesting that they organize the Kishwaukee crew. Respondents answered by advising the crew that if they wanted a union, they would have to sign authorization or pledge cards which were enclosed. By means of these cards, the crew could apply for membership and authorize the Unions to bargain on their behalf. By October 14, eight of the nine crew members had executed the pledge cards and handed them back to O'Laughlin and Leuchtmann who, in turn, sent them on to respondents with a request that the Unions send representatives to confer with the crew. About the middle of October, Capt. Burt, the Master of the Kishwaukee, discharged O'Laughlin for reasons not disclosed in this record.
 
 
 5
 Peddie's Landing, located just outside Cairo, Illinois, is a moorage for barges. There are three moorages about a thousand feet apart known as Lower Fleet, Middle Fleet and Upper Fleet. About 2:30 a. m. on November 3rd, the Kishwaukee, under the command of Capt. Burt, with her tow consisting of two barges, tied up at the Middle Fleet of Peddie's Landing. Capt. Burt went ashore to call his brother, Capt. J.W. in Louisiana for further orders. He noticed O'Laughlin look inside the watchman's tower and thereafter leave with three men in the direction of Middle Fleet. He hurriedly concluded the telephone call saying "It looked like there was going to be trouble."
 
 
 6
 O'Laughlin, Gordon Knapp, John Simpson who was Knapp's assistant, and another, crossed to Middle Fleet, boarded the Kishwaukee and entered the galley where seven of the nine crew members had gathered for the purpose of meeting Union representatives. For a short time this group sat or stood around the galley drinking coffee and discussing the problems of the crew. A few minutes later, Capt. Burt entered the galley and inquired what the crew was doing. Knapp introduced himself and his companions except for O'Laughlin who was temporarily absent, and said "We are organizing the boat." Capt. Burt replied: "The hell you are! I am the Master of this boat and I want you to get off it." About this time O'Laughlin returned to the galley and Capt. Burt ordered him off the boat using obscene language and striking him over the head with a flashlight, drawing blood. Knapp stepped between the two men and shoved the captain into a corner. Capt. Burt worked himself into a towering rage, offered to fight with the Union representatives using knives, and then ordered Leuchtmann to get the police. Leuchtmann refused to do so stating he would not ask police to arrest people whom he had invited aboard.
 
 
 7
 The Union representatives were aboard the boat about forty minutes. At one point Captain Burt threatened to get his shotgun from the pilot house and shoot "the whole shebang." Knapp prevented the captain from making good his threat, and a bit later went to the pilot house, located the shotgun, unloaded it and hid the shells. This gun was later turned over to the Cairo police. Capt. Burt had further words and he attempted unsuccessfully to loosen his boat.
 
 
 8
 The crew members decided to protest Capt. Burt's refusal to confer with the Union representatives by leaving the boat and going on strike. Thereafter, the members of the crew went to their quarters, picked up their gear and left the Kishwaukee, leaving only Capt. Burt and Simpson, one of the Union representatives. Capt. Burt, in an altercation with Simpson, grabbed a meat cleaver and, after threatening Simpson, barricaded himself in the pilot house. Leuchtmann and his wife, both crew members, were the last to leave the Kishwaukee. Capt. Burt offered them more money if they would stay aboard, but the Leuchtmanns refused. The whole crew gathered on shore where they summoned the Cairo police to inspect their luggage so that no claim could be made that they had removed any property belonging to the Kishwaukee.
 
 
 9
 During the night when Knapp was the only Union representative on the barges, Capt. Burt returned to the deck of the Kishwaukee with a fifteen inch butcher knife in his hand, and informed Knapp he was going to undo the tug lines and take the tug out. Knapp replied this would subject him to a heavy fine and imprisonment as a violation of the Coast Guard regulations. Capt. Burt threatened that he would run the knife into Knapp if he did not leave him alone. He then made a break for Knapp, and for ten minutes unsuccessfully pursued Knapp around the barge with the butcher knife. He then returned to the tug. Capt. Burt again attempted to unfasten the lines, but Knapp, standing on the adjacent barge, "whipped" the lines so that the captain was unable to free the boat. The captain then picked up a metal "toothpick"[1] and hurled it at Knapp but did not hit him. Knapp picked up the "toothpick" and advanced towards the captain who retreated to the pilot house. Capt. Burt then called his brother, Capt. J.W., on the marine telephone and told him he was being held a prisoner. The trial examiner found that Capt. J.W. instructed Capt. Burt not to move the vessel until help arrived. The trial examiner further found that Knapp testified, without contradiction, that he sent word to Capt. Burt four times by the watchman that he was free to go ashore at any time and that Knapp would guarantee his safety. Capt. Burt denied this statement by Knapp, but the trial examiner apparently believed the Knapp version.
 
 
 10
 At 7:00 a. m. the local Coast Guard commander boarded the Kishwaukee and read to Capt. Burt the regulations which forbade sailing the vessel in a navigable river without an adequate crew, and told the Captain he would not be permitted to take the tug out alone. The Captain then stated he would not take the ship out if Knapp and Simpson who were then present, left the barges, whereupon these two with the Coast Guard commander went ashore.
 
 
 11
 At 8:00 a. m. Capt. Burt left the Kishwaukee and proceeded to a Cairo hotel. Three crew members were contacted by Capt. J. W. and brought to the office of the attorney representing the Bantas. They were asked to sign statements to the effect that the Union representatives had forced them off the Kishwaukee. They refused to do so saying that such statements would be untrue.
 
 
 12
 The occurrences just narrated are described generally in the record as the November 3rd incidents.
 
 
 13
 Capt. J.W., in Louisiana, recruited three of his brothers, three nephews, a son and two or three unemployed deck hands, and armed them with .45 or .38 caliber revolvers. He transported some of them to Cairo, Illinois, by rail, and others in his Cadillac automobile in the trunk of which he carried a 12 gauge riot shotgun. Escorted by police, the Bantas and party boarded the Kishwaukee at 2:30 a. m. November 4, 1954. They unloosed the tug from the barges and spent the next two days moving slowly down the river stopping at two ports on the Kentucky side where more personnel from Louisiana was picked up. The Kishwaukee then met the George W. Banta which was proceeding up the river with a tow of four barges. Both tugs tied up at Wickliffe, Kentucky, late in the afternoon of November 5, 1954.
 
 
 14
 On November 6, 1954, at about 6:00 a. m., the Kishwaukee lashed to its sister vessel, the George W. Banta, and the four barges began moving across the river to Peddie's Landing where the union picket line was operating. Capt. J.W., Capt. Burt and those of the crew not engaged in operating the boats, lined up on the lead barge. Capt. J.W. instructed those about him to "shoot to kill" if their lives were in jeopardy, otherwise to aim at the arms and legs of the pickets.
 
 
 15
 As the tow boats and barges approached from twelve to twenty pickets crossed from the shore to Husky Barge No. 70 which was moored in the Fleet. The watchman warned the pickets that the men on the approaching barges and tugs were armed, and advised the pickets to carry something to protect themselves. A number of pickets sized toothpicks, another had a Stillson wrench, and still another had a 24-inch screwdriver. None of the pickets carried fire arms.
 
 
 16
 When the lead barge came within shouting distance, Knapp asked Capt. J. W. to respect the picket line and not take out any barges from the Fleet. Capt. J.W. shouted: "Who is going to stop us?" Knapp replied: "We are" and waved the toothpick he had in his hand. Capt. J.W. responded: "That is not big enough to stop us", and told Knapp and the other pickets that if they didn't get off his equipment he would be compelled to shoot them off. He repeated this statement three times.
 
 
 17
 When the two groups were about fifty feet apart, Capt. Burt ordered his nephew Ernest to fire the shotgun at that "four-eyed bastard in the checked shirt" (Knapp). The nephew did not shoot immediately, but shortly thereafter the group started firing. Three rounds were fired from the shotgun, and some fifteen to forty rounds from the revolvers. Knapp hid behind a nearby capstan. Six or eight revolver shots hit the capstan and finally a revolver bullet hit Knapp in the left arm, tearing away a part of the bone. Within minutes, all union adherents had fled. The Kishwaukee's rigging was picked up from Husky Barge No. 70, but no attempt was made to move the barge.
 
 
 18
 The events hereinbefore described, commencing on November 4 and ending with the shooting, are described in the record as the November 6th incidents.
 
 
 19
 The Unions and the Employer each filed charges of unfair labor practices. Surprisingly, the general counsel issued a complaint based upon the Employer's charges, but refused to issue a complaint based upon the claim of Respondents that the Company had coerced its employees in violation of § 8(a) (1) of the National Labor Relations Act (29 U.S.C.A. § 151 et seq.), and had discriminately discharged an employee for union activity in violation of § 8(a) (3) of the Act.
 
 
 20
 The trial examiner entered findings of fact and conclusions of law in which he found Respondents had not engaged in unfair labor practices. However, the Board, by a vote of three to one, concluded Respondents had engaged in such practices. The Board found the Respondent Unions and their agent, Knapp, in violation of § 8(b) (1) (A) of the Act, restrained and coerced employees in the exercise of their rights to refrain from joining or assisting a labor organization.
 
 
 21
 In discussing the November 3rd incidents, the Board emphasized that Respondents remained on the Kishwaukee after Capt. Burt had ordered them off. The Board also relied on Simpson's threat to lick Capt. Burt which was made in the presence of some of the crew. Also, that Respondents prevented Capt. Burt from moving the Kishwaukee out of Cairo under circumstances as would insure the crew learning about it. The Board also cited the November 6th incidents and found that thereby Respondents restrained and coerced employees within the meaning of § 8(b) (1) (A) of the Act by massing pickets on Husky Barge No. 70, and brandishing weapons at persons on the towboats.
 
 
 22
 The record is entirely devoid of evidence that on November 3rd representatives of Respondents used force to compel the crew to join the Respondent Unions or that they forced the crew to leave the tug. In spite of one sentence in Knapp's testimony which the Board has seized upon, the purpose of the visit of Union members to the tug was not to organize the crew in the sense that term is used by the Board. Eight of the nine members had executed and delivered union authorization cards prior to that date, and had done everything necessary to designate their collective bargaining representative. The crew on its own initiative had actually organized before November 3rd.
 
 
 23
 The second basis for the Board's holding as to the November 3rd incidents is that Respondents committed a trespass in coming on board the Kishwaukee. We think it is unrealistic to consider that the visits of the four union representatives to the crew at the invitation of the crew was one without lawful authority. The Board has long taken the position that access to crews on ships in port is necessary for the protection of the rights of the employees to bargain collectively through representatives of their own choosing. Cities Service Oil Co., 25 N.L.R.B. 36, 47, enforced as modified, N.L.R.B. v. Cities Service Oil Co., 2 Cir., 122 F.2d 149.
 
 
 24
 But the Board insists that by staying on board and imposing "physical restraint" on Capt. Burt, Respondents coerced the crew members. The Union representatives were peaceably discussing working conditions with the crew in the galley. Then Capt. Burt burst in upon the meeting and he was the agressor in an unprovoked assault upon O'Laughlin. Knapp took a minimum of defensive steps in immobilizing the Captain and in preventing him from obtaining his loaded shotgun. The Captain was acting "like a wild man" and showing signs of going "berserk." We cannot conceive how the mild defensive measures which were taken could have coerced the crew members to join a union.
 
 
 25
 The balance of the Board's order is based upon the November 6th incidents. The decision states: "The action of the Respondents' agents on November 6, in massing on Husky Barge No. 70 and brandishing weapons at the persons on the tow, was a threat of violence not only against the Employers but directly against the employees on the tow approaching the shore to cross the Respondents' mass picket line. We find that by such threats of physical violence against employees the Respondents restrained and coerced employees within the meaning of § 8(b)(1)(A) of the Act."
 
 
 26
 It seems far-fetched indeed to picture men, who had been instructed to shoot to maim, and each of whom possessed a loaded firearm, being intimidated and coerced by a dozen to twenty Union men on a barge carrying toothpicks, a screwdriver and a wrench.
 
 
 27
 The majority of the Board makes a point that on November 6 the Employer, in proceeding to Peddie's Landing with two tugs, was engaged in the performance of its normal business operations, this in spite of the fact the tugs carried oversized crews armed with revolvers and shotguns which the trial examiner aptly noted can hardly be characterized as tools of the trade for river boatmen. Furthermore, only one tug was needed for the job.
 
 
 28
 The trial examiner properly found that the Employer instigated the violence which occurred on November 6th. Considering the disparity of weapons, the strikers with toothpicks, a wrench and a screwdriver on one side and the men on the tugs armed with a shotgun and revolvers, we cannot justify the conclusion that Respondents coerced or restrained the men on the tugs. Furthermore, § 8(b) (1) (A) makes it unlawful for a labor organization or its agents "to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7." In our judgment, on the morning of November 6th, the employees on the tug were not exercising "rights guaranteed in section 7" of the Act.
 
 
 29
 Petition for enforcement of the Board's order is
 
 
 30
 Denied.
 
 
 
 Notes:
 
 
 [1]
 River barges are customarily equipped with ratchets to tighten connecting wire. A pipe several feet long is usually inserted over the handle of the ratchet to give the operator more leverage. The short ratchet and in particular the pipes are called "toothpicks."