John A. PENELLO, Regional Director of the Fifth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

SEAFARERS' INTERNATIONAL UNION OF NORTH AMERICA, ATLANTIC AND GULF DISTRICT, AFL–CIO; International Organization of Masters, Mates & Pilots, Inc., AFL–CIO; Local 9, International Organization of Masters Mates & Pilots, Inc., AFL–CIO; National Marine Engineers Beneficial Association, AFL–CIO; and Local 11, National Marine Engineers Beneficial Association, AFL–CIO, individually and as agents for each other, Respondents.

Civ. A. No. 2371.

United States District Court
E. D. Virginia,
Norfolk Division.

Aug. 9, 1957.

Kenneth C. McGuiness, Stephen Leonard, General Counsel, Winthrop A. Johns, Asst. Gen. Counsel, Washington, D. C., David C. Sacks, Chief Law Officer, Baltimore, Md., and Joseph I. Nachman, Washington, D. C., for N.L.R.B.

Devany & Redfern, Norfolk, Va., for Seafarers' Internat. Union.

Jett, Sykes & Howell, Norfolk, Va., for M. E. B. A. and M. M. P.

WALTER E. HOFFMAN, District Judge.

Petitioner herein requests this Court to adjudge respondents, National Marine Engineers Beneficial Association, AFL–CIO (referred to as MEBA), its Local 11, and their agent, Jesse M. Calhoon, to be in civil contempt of court for having violated the order of this Court as entered on April 4, 1957, and modified May 13, 1957, in which the respondents, among others, were enjoined and restrained, within the Port of Hampton Roads, from:

"(a) Picketing, as modified in (b) below, at the Norfolk, Virginia dock of Norfolk & Western Railway Co., the Newport News, Virginia, dock of Chesapeake & Ohio Railway Co., or at the premises of any other employer or person where any vessel of American Coal Shipping, Inc. may come to load, other than at the gangplank of said vessel with permission of the owner of said premises, for any object set forth in (b) (1) or (2) below; or

"(b) In any manner, including picketing, orders, instructions, directions, appeals, or by any like or related acts or conduct, or by permitting any such to remain in existence or effect, engaging in, or inducing or encouraging the employees of any other employer, to engage in, a strike or concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities, or perform any services; where an object thereof is: (1) to force or require Norfolk and Western Railway Co., Chesapeake & Ohio Railway Co., or any other employer or person, to cease doing business with American Coal Shipping, Inc.; or (2) to force or require employers or persons utilizing the services of contracting stevedoring companies to cease doing business with any other employer or person or contracting stevedores operating at the Norfolk, Virginia, dock of Norfolk & Western Railway Co., the Newport News, Virginia, dock of Chesapeake & Ohio Railway Co., or at the dock of any other employer or person where any vessel of American Coal Shipping, Inc., may come to load."

The controversy involves a labor dispute between MEBA and American Coal Shipping, Inc. (referred to as American). Without detailing the facts presented at the time the Court granted a temporary injunction, it is sufficient to state that certain rail carriers, including the Norfolk & Western Railway (N. & W.), have a substantial interest in the successful operation of American. While American has a local office at Norfolk in an office building housing many other fields of endeavor, it can hardly be said to have any permanent situs where the Union could, with any slight hope of success, publicize the facts concerning the dispute with the shipowners. As of the date of the injunction hearing in February, 1957, American had four vessels in operation, with thirty-one additional

ships expected to be in operation prior to the end of the year. Thus the situs of American's business was, in this locality, substantially confined to the vessels, including the S. S. Coal Miner, which is the ship involved in this controversy.

Holding that the respondent Unions were clearly not within the criteria evolved in the Moore Dry Dock case, 92 NLRB 547, and that evidence of "premature" picketing existed in that picketing was conducted at the entrances to the railroad yards while the vessel was at anchor in the stream awaiting loading instructions, this Court found that there was *reasonable cause* to believe that petitioner's charges were true and passed the matter on to the Board for a determination of possible unlawful secondary action.

On May 31, 1957, with full knowledge of the Court's injunctive order, MEBA caused picketing operations to be conducted on public property at the entrance to property owned by the N. & W. and leased in part to Continental Grain Company, Lambert's Point Docks, Inc., and McLean Construction Company. Engaged in work at these premises on the date stated were, in addition to the foregoing, a stevedoring firm and three contracting firms. For employees of these concerns to reach their work on the leased premises, it was necessary to cross or come within the immediate proximity of the pickets established by MEBA. There is no affirmative evidence that any employee was induced or persuaded in any degree not to cross the picket line or to stop work; nor is there any suggestion that the pickets engaged anyone in conversation. The picket signs clearly revealed that the labor dispute was between American and MEBA.

Unlike the factual situation presented at the time of the hearing on the injunction, the picketing commenced and continued only during the time the Coal Miner was actually docked at the pier. This removes from consideration in this contempt proceeding the vital question of "premature" picketing which this Court believed to be a matter of general policy to be considered by the Board. And, as indicated above, there is a total absence of evidence reflecting any efforts on the part of the Union to converse with workers entering the premises of the secondary employer, or to otherwise induce them not to cross the picket line or to stop work; all of which existed by reasonable inferences at the time the injunction was granted.

The position of respondents may well give rise to an aura of suspicion. Respondent, Calhoon, stated on three days prior to the picketing that he talked with the four engineers on board the Coal Miner in an effort to persuade them to leave their jobs. This he admittedly had the right to do. At that time the Coal Miner was at a local shipyard being refitted to carry grain. The vessel proceeded to the dock of Continental Grain and, on May 31, 1957, Calhoon caused the pickets to be placed at the common entrance to the property, a distance of 2,200 feet from the vessel but the closest point on land where picketing could be accomplished on public property. No request to picket at the gangplank was made of the lessees of the premises, and, though the evidence reveals that prior to the injunction hearing MEBA had requested N. & W. to permit picketing inside the railway yard, this cannot possibly be extended to all properties owned by the N. & W. The reason for picketing, as assigned by Calhoon, is that one of the engineers on the Coal Miner had advised him that he understood the labor dispute was at an end. Calhoon admits that he verbally endeavored to persuade this engineer to the contrary, but deemed it proper to establish the picket line in order to "prove what he had said" as he knew that the engineers would be going to and from the vessel during the day and night of sailing. He further concedes that MEBA, in conjunction with the International Organization of Masters, Mates & Pilots, had picketed American's vessels by launch while the vessel was at anchorage and occasionally while at the dock. Petitioner tacitly admits that picketing by

launch is lawful where the picketed vessel is owned and operated by the primary employer.

Nor can respondents successfully urge that they were without knowledge of the interest of Continental Grain and Lambert's Point Docks in the leased premises. Signs at the common entrance clearly reveal the operators of the premises. It is a matter of general knowledge within the area. The grain elevator has, for many years, been known as the "Norfolk & Western Ry. Grain Elevator", but this is simply a descriptive term and the sign at the entrance obviously shows that Continental Grain Company is the operator of this elevator.

■ Manifestly, MEBA endeavored to establish its picket line on the date stated within the four conditions specified in Moore Dry Dock, supra, approved by this Circuit in Piezonki v. N.L.R.B., 4 Cir., 219 F.2d 879, 883, wherein it is said that common situs picketing, in order to qualify as primary and lawful, must meet these tests:

"(a) The picketing is strictly limited to times when the situs of dispute is located on the secondary employer's premises;

"(b) At the time of the picketing the primary employer is engaged in its normal business at the situs;

"(c) The picketing is limited to places reasonably close to the location of the situs; and

"(d) The picketing discloses clearly that the dispute is with the primary employer."

■ It is only as to (c) above that petitioner takes issue with respondents. The mere fact that the picketing took place some 2,200 feet from the vessel is immaterial when we find that this is the closest land point on public property where picketing operations could be conducted, and we are told that the engineers on the vessel of the primary employer were at liberty to go to and from the vessel until two hours prior to sailing time. Petitioner asserts, however, that as a condition precedent to complying with condition (c) in Moore Dry Dock it is incumbent upon the Union to request permission to picket at a location closer to the situs, i. e., the vessel. In Columbia-Southern Chemical Corp., 110 NLRB 206, 208, the Board infers that such may be a requirement when it is said:

"Apart from any other considerations, it suffices to establish a violation of Section 8(b) (4) (A) [29 U.S.C.A. § 158(b) (4) (A)] that, so far as the record shows, respondent Pipefitters made no effort to obtain permission from Columbia-Southern to picket inside the construction area at the actual situs of the primary dispute, Westheimer's boiler removal job—but chose, rather, to picket at a remote approach to the plant premises used by employees of secondary employers in common with the employees of Westheimer."

■ If the Board intended, by the foregoing quotation, to provide that a request to picket at the situs is a condition precedent to compliance with (c) in Moore Dry Dock or, stated otherwise, intended to establish an additional criteria in order for common situs picketing to qualify as primary and lawful, then the petitioner must prevail. An examination of the Board's decision in Columbia-Southern Chemical Corp., supra, suggests that the failure to make any effort to secure permission from the secondary employer to picket at the actual situs of the primary dispute was merely an added factor in proving that the illegal picketing was deliberately designed to disrupt the operations of the secondary employers. The quotation is, in the opinion of this Court, merely dicta under a state of facts which did not fulfill the criteria established in the Moore Dry Dock case for evaluating the lawfulness of picketing at the premises of a secondary employer. Moreover, the Board does not consider the necessity of a formal request to picket at the actual situs where it is rather apparent that the request would be futile. In the judg-

ment of this Court, the Columbia-Southern case did not so extend or amplify the requirements of Moore Dry Dock.

It is contended, however, that an additional criteria has been added to Moore Dry Dock under the Board's decisions in Washington Coca-Cola Bottling Works, Inc., 107 NLRB 104, Ready Mixed Concrete Co., 117 NLRB 172, and Campbell Coal Co., 116 NLRB 124, wherein the Board held that when another separate situs is available, picketing at a common situs is prohibited. Even applying the Board's rule it is certainly a strained construction to hold that a vessel moored to a dock for loading purposes has a fixed situs or place of business in the area. It is at best a temporary situs for the vessel and one of the essential purposes of picketing in conveying messages to the employees of the primary employer would be destroyed if this Court accepted petitioner's contention that, under the injunction issued, picketing must be confined to a launch manipulating, with obvious danger, in a slip where the picketed vessel is docked. This falls far short of the right to "adequately" picket the premises as referred to in Campbell Coal Co., supra.

It is apparent that the Board's attempted additional criteria as aforesaid has not met the test of court approval. The Campbell Coal Company order was reviewed, sub nom. Sales Drivers, etc. v. N.L.R.B., 97 U.S.App.D.C. 173, 229 F. 2d 514, 517, certiorari denied 351 U.S. 972, 76 S.Ct. 1025, 100 L.Ed. 1490, and the Board's ruling, to the effect that when a separate situs is available picketing at a common situs is prohibited, was expressly disapproved. In essence, the court said:

"The existence of a common site, of such incidental effect, and of another place which can be picketed, are factors to be considered in determining whether or not the section has been violated, but alone are not conclusive. The presence of these factors does not warrant a failure to consider other facts which are relevant and perhaps countervailing.

See N.L.R.B. v. General Drivers, Warehousemen and Helpers, Local 968, 5 Cir., 225 F.2d 205, at pages 209–210. No rigid rule which would make these few factors conclusive is contained in or deducible from the statute. To read it into the statute by implication would unduly invade the application of section 13 which preserves the right to strike 'except as specifically provided' in other provisions of the act. It is not specifically provided that picketing at a common site, with an incidental effect upon employees of a neutral employer, is unlawful in every case where picketing could also be conducted against the primary employer at another of its places of business."

The fact that a floating vessel constitutes the actual situs of the primary employer affords abundant reasoning for a liberal construction of the common situs picketing rule. This is not to say that all common situs picketing is lawful where compliance is had with the original four conditions in Moore Dry Dock, but the fair inference is that strict fulfillment of these conditions raises a rebuttable presumption that the picketing is lawful. When we consider the criticism of the Moore Dry Dock rule as stated in the Otis Massey case, N.L.R.B. v. General Drivers, Warehousemen and Helpers, Local 968, 5 Cir., 225 F.2d 205, it would seem to follow that, where there is plausible reasoning for common situs picketing, the evidentiary tests in Moore Dry Dock are sufficient to establish the existence of lawful picketing in the absence of reasonably substantial evidence tending to show that an unlawful objective existed, as contrasted with acts which may inferentially suggest an object of the accomplishment of a secondary boycott.

In the instant case the picketing of May 31, 1957, was without any consequences. As was stated in Douds v. Local 50, 2 Cir., 224 F.2d 49, 51:

"The appellant argues that picketing 'inherently encourages' workers

not to work behind the picket line, and that it must be 'presumed' that the appellee intended such consequences because one 'is held to intend the foreseeable consequences of his conduct', citing Radio Officers' Union v. N.L.R.B., 347 U.S. 17, 45, 74 S.Ct. 323, 98 L.Ed. 455. This argument might be persuasive if the picketing had had any consequences. It did not. No employee of Arnold's refused to cross the picket line or to cease work. If the appellee is to be 'presumed' to intend the consequences which follow from its conduct, the inference to be drawn is that Local 50 did *not* intend to influence the employees of Arnold to cease work."

■ Accepting these principles, the evidence in this case falls appreciably short of the clear and convincing proof required to justify an adjudication that respondents are guilty of civil contempt, and this is so even though evidence of respondents' acts prior to the granting of the temporary injunction are given due weight. Respondents elected to gamble on the consequences of their isolated instance of picketing. Another effort along similar lines, but with different resultant effect on the employees of the secondary employer, may bring forth an additional proceeding by way of either civil or criminal contempt even though there may be compliance with the conditions in Moore Dry Dock. Such are the inevitable risks which a labor organization is frequently willing to accept. Repeated actions with other consequences all have evidentiary value in determining the object of the picketing under Section 8(b) (4) (A) of the Act.

The petition for adjudication of respondents in civil contempt is accordingly dismissed. Counsel for respondents will prepare an appropriate order, referring to this memorandum opinion in lieu of specific findings of fact and conclusions of law, and, after presentation to counsel for petitioner for inspection, present the same to the Court for entry.