274 F.2d 167
 NATIONAL MARINE ENGINEERS BENEFICIAL ASSOCIATION, AFL-CIO, and International Organization of Masters, Mates and Pilots, Inc., AFL-CIO, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
NATIONAL MARITIME UNION, AFL-CIO, Rivers Joint Organizing Committee, National Marine Engineers Beneficial Association, AFL-CIO, and International Organization of Masters, Mates and Pilots, Inc., AFL-CIO, Respondents.
 No. 71.
 Docket 25300.
 United States Court of Appeals Second Circuit.
 Argued November 19, 1959.
 Decided January 13, 1960.
 
 Lee Pressman, New York City (Ned R. Phillips, New York City, on the brief), for respondent National Marine Engineers' Beneficial Ass'n, AFL-CIO.
 Betty H. Olchin, New York City (Marvin Schwartz, New York City, on the brief), for petitioner International Organization of Masters, Mates & Pilots, Inc.
 Fannie M. Boyls, Washington, D. C. (Stuart Rothman, Gen. Counsel, Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Ass't. Gen. Counsel and Margaret M. Farmer, Washington, D. C., on the brief), for National Labor Relations Board.
 Before MEDINA, MOORE and FRIENDLY, Circuit Judges.
 FRIENDLY, Circuit Judge.
 
 
 1
 This case relates to an order of the National Labor Relations Board dated July 29, 1958, requiring petitioners National Marine Engineers Beneficial Association, AFL-CIO (MEBA), and International Organization of Masters, Mates and Pilots, Inc., AFL-CIO (MMP), and also National Maritime Union, AFL-CIO (NMU), and Rivers Joint Organizing Committee (RJOC), to cease and desist from violating the provisions of § 8(b) (4) (A) and (B) of the National Labor Relations Act, 29 U.S.C.A. § 158(b) (4) (A) and (B), that make it an unfair labor practice "for a labor organization or its agents * * * to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, * * * transport or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services" where an object thereof is (A) to force or require an employer to cease doing business with any other person or (B) to force or require an employer to recognize or bargain with a labor organization that has not been duly certified as the representative of his employees. The case comes to us on petitions of MEBA and MMP to review and set aside the order as to them and upon a cross-petition by the Board requesting enforcement of its order against all four labor unions. NMU and RJOC did not appear. We have jurisdiction because MEBA and MMP maintain offices and do business within this circuit, 29 U.S.C.A. § 160(f). The principal issue is whether there was sufficient basis for the Board's finding that the conduct of MEBA and MMP, which it held to violate § 8(b) (4) (A) and (B), was conduct by "a labor organization or its agents" to which alone § 8 (b) applies.
 
 
 2
 In August, 1954, NMU, MEBA and MMP set up RJOC. The purpose of doing this was to enable the member unions to organize the entire crews of commercial vessels on the Mississippi and its tributaries with the least organizing manpower. The policies of RJOC were determined by a committee composed of a representative of AFL-CIO, acting as coordinator, and of officials of NMU, MEBA and MMP. At least five organizers were assigned to assist in RJOC's work; two were supplied by NMU and one each by MMP, MEBA and AFL-CIO.
 
 
 3
 The subject of RJOC's organizing efforts in the instant case was the S&S Towing Company of Joliet, Illinois. S&S owned two tow-boats, the Franklin D. Roosevelt and the Sandra Marie. During April, 1957, these boats were exclusively engaged in towing barges for Standard Oil Company of Indiana between the latter's barge terminal at Chicago and its refinery at Wood River, Illinois, and from the Wood River refinery into Missouri.
 
 
 4
 The Board found that RJOC and its three sponsoring organizations, NMU, MEBA and MMP, after calling a strike against S&S, induced Standard's employees to refuse to handle articles transported by S&S in order to force Standard to refuse to deal with S&S, and to force S&S to bargain with the unions as the collective bargaining representatives of the employees of S&S although the unions had not been certified as such. The unions' activities succeeded. Their establishment of a picket line and a threat by Standard's employees not to cross it led Standard to notify S&S that Standard was arranging for another company to tow the oil barges until S&S settled its labor dispute. S&S speedily capitulated; on the next day it agreed on an election, the agreement being signed by the RJOC coordinator "For the Union." Two days later the coordinator advised Standard that the strike against S&S was settled. In the election the employees were given the choice of voting for or against the unions as a group; the unions won. Over a year later, in July, 1958, the Board entered the order here under review requiring the unions (1) to cease and desist from inducing the employees of Standard or of any employer other than S&S to engage in a strike or concerted refusal to work with the object of forcing the employer to cease doing business with S&S or to force S&S to recognize the unions as the collective bargaining representative of its employees unless certified, and (2) to post a form of notice to that effect at their respective business offices and mail it to Standard and S&S for similar posting, the companies willing.
 
 
 5
 The findings as to the unions' conduct are not challenged by RJOC or MNU, and though MEBA's and MMP's petitions for review preserved the point, they have not briefed or argued it before us. There was abundant evidence to support the findings of conduct forbidden by § 8(b) (4) (A) and (B) if petitioners come within them. Since NMU and RJOC concededly were "labor organizations," we therefore grant enforcement against them.
 
 
 6
 The facts appropriately found in the intermediate report of the Board's trial examiner, 121 N.L.R.B. at pages 219-220, make it unnecessary to discuss another ground for review asserted by MMP and not waived by MEBA although not argued by it, namely, that if there was any violation of § 8(b), it was committed by the locals rather than by the parent organizations.
 
 
 7
 We come therefore to the issue whether the action here taken by MEBA and MMP was action by "a labor organization or its agents" within the meaning of § 8(b).
 
 
 8
 The statutory background is made up of three definitions in § 2 of the Act, 29 U.S.C.A. § 152. Under § 2(5) a "labor organization" is one "in which employees participate." Section 2(3) excludes from the definition of "employee" "any individual employed as a supervisor" or any individual employed by an employer subject to the Railway Labor Act, 45 U.S. C.A. § 151 et seq. Section 2(11) defines "supervisor." We set forth in the margin these sub-sections insofar as pertinent.[1]
 
 
 9
 MEBA says its membership is composed exclusively of supervisors; MMP says its members also are all supervisors, save for the membership in "Associated Maritime Workers Locals" of certain railway workers who, like supervisors, are excluded from the statutory definition of "employee." The Board denies this, and contends in the alternative that, on the facts here, since RJOC and NMU were "labor organizations," MEBA and MMP, even if not themselves "labor organizations," can be held as "agents" under the provision of § 8(b) quoted above. To this alternative contention MEBA and MMP reply that (1) the legislative history shows that § 8(b) does not impose independent liability on an "agent" of a labor organization, and (2) there was no evidence sufficient to warrant a finding that they were acting as agents for NMU and RJOC.
 
 
 10
 We see no reason why a labor union, even though not itself a "labor organization," cannot be held under § 8 (b) if it has acted as an agent for a "labor organization." We do not doubt that, as MEBA and MMP argue, a prime purpose for the inclusion of "or its agents" in § 8(b) and the specification of the standard of agency in § 2(13) was a desire of Congress to prevent application under the National Labor Relations Act of the view, stated in United Brotherhood of Carpenters and Joiners of America v. United States, 1947, 330 U.S. 395, 406, 67 S.Ct. 775, 778, 91 L.Ed. 973, that § 6 of the Norris-LaGuardia Act, 29 U.S.C.A. § 106, providing that "No officer or member of any association or organization * * * participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or ratification of such acts after actual knowledge thereof," meant "something different from corporate criminal responsibility for the acts of officers and agents in the course or scope of their employment." Undoubtedly, as Senator Taft said, 93 Cong.Rec. 6859 (1947), in a speech on which petitioners rely, the new language in the Labor Relations Act had the effect that "* * * union business agents or stewards acting in their capacity of union officers may make their unions guilty of an unfair labor practice in the bill, even though no formal action has been taken by the union to authorize or approve such conduct." But Senator Taft did not say this was its only effect.
 
 
 11
 The Board has long held that persons acting for employers can be found guilty of unfair labor practices, both under the definition of "employer" as including "any person acting in the interest of the employer" in § 2(2) of the original Act, N. L. R. B. v. Sun Tent-Luebbert Co., 9 Cir., 1945, 151 F.2d 483, certiorari denied, 1946, Merchants and Manufacturers Association of Los Angeles v. N. L. R. B., 329 U.S. 714, 67 S.Ct. 44, 91 L.Ed. 620; National Labor Relations Board v. Mylan-Sparta Co., 6 Cir., 1948, 166 F.2d 485, and under the Taft-Hartley definition of "any person acting as an agent of an employer," National Labor Relations Board v. Russell Mfg. Co., 5 Cir., 1951, 187 F.2d 296. After the Taft-Hartley amendment the Board seems to have entertained no doubt that agents of labor organizations could be likewise held, Perry Norvell Co., 80 N.L.R.B. 225 (1948), United Furniture Workers, 81 N.L.R.B. 886 (1949), see Penello v. International Union, United Mine Workers of America, D.C.1950, 88 F.Supp. 935; and it continues to act on that view, Local 1016, United Brotherhood of Carpenters & Joiners, et al., 117 N.L.R.B. 1739, enforced in part, 2 Cir., Jan. 6, 1960, N. L. R. B. v. Local 1016, United Brotherhood of Carpenters & Joiners, 273 F.2d 686. Normally the point is not contested, since the cease and desist order against the labor organization includes all officers, representatives and agents in any event. We think the Board is right in construing § 8(b) as empowering it to fasten independent liability on an agent of a labor organization, whether this be an individual, a labor union or any other entity, just as it could in the case of an employer. That is what the words say, the history relied on by petitioners does not alter them, and any basis for negative inference from the absence of corresponding words in § 8(a) is removed by the presence of those words in the definition of "employer" in § 2(2). Judge Miller held in his dissenting opinion in DiGiorgio Fruit Corp. v. N. L. R. B., 89 U.S.App.D.C. 155, 191 F.2d 642, 28 A.L. R.2d 377, certiorari denied, 1951, 342 U.S. 869, 72 S.Ct. 110, 96 L.Ed. 653, that a labor union, not itself a labor organization, might be held as "agent" for a "labor organization," and the majority, while finding no agency in fact, did not disagree with this view of the law.
 
 
 12
 We find less cogency in the Board's position with respect to the fact of agency. We would have difficulty in finding sufficient evidence to support a conclusion that MEBA and MMP here acted as agents for NMU as such, and RJOC was rather the creature of the labor unions than their principal. The Board and its counsel quote to us the familiar language of Hitchman Coal & Coke Co. v. Mitchell, 1917, 245 U.S. 229, 249, 38 S.Ct. 65, 75, 62 L.Ed. 260, that "when any number of persons associate themselves together in the prosecution of a common plan or enterprise, lawful or unlawful, from the very act of association there arises a kind of partnership, each member being constituted the agent of all * * *" We do not find it necessary to determine whether this doctrine, enunciated as a principle of evidence, would be enough to support a finding of agency under § 8(b). For, while the record is far from conclusive, we believe the evidence was sufficient to warrant the Board in finding that MEBA and MMP included "employees" and were therefore "labor organizations."
 
 
 13
 The trial examiner based his conclusion that MEBA and MMP were "labor organizations," despite their claims that their membership was composed solely of supervisors, on a belief that the Board's decision in National Organization Masters, Mates and Pilots of America, Inc., AFL-CIO, et al. (J. W. Banta Towing Company, Inc.), 116 N.L.R.B. 1787,[2] was binding on him. The Banta case was an unfair labor practice case against the same labor unions as here. The issue whether MEBA and MMP were "labor organizations" was not discussed, for the excellent reason that they had filed an answer admitting they were; and the trial examiner made a finding, approved by the Board, that took them at their word. After the Board's adverse decision on the merits in Banta, MMP and MEBA sought to amend their answer and reopen the record so that the Board might receive evidence as to whether they were "labor organizations," claiming the attorney who had filed the answer was not authorized to admit this; the Board denied this request. In its opinion in the instant case, the Board says it agrees with the trial examiner's finding here that MEBA and MMP are "labor organizations" as defined in § 2(5), "not only because of the previous decision in the Banta case, but for the following additional reasons," which we shall discuss below.
 
 
 14
 The Board's decision in the Banta case did not have the controlling force attributed to it by the trial examiner and perhaps in some degree by the Board. To be sure since the answer was not limited to the particular case, the admission was evidence against MEBA and MMP elsewhere, and this was not deprived of evidential force by the subsequent unsuccessful attempt to withdraw it. However, neither the admission nor the decision based upon it was conclusive in another case. See United Ins. Co. of America v. N. L. R. B., 7 Cir., 1959. It therefore becomes necessary to examine such other evidence as the record contains.
 
 
 15
 We shall look first at the evidence with respect to the workers of S&S on whose behalf the unions acted. There was no substantial evidence to refute MMP's claim that all the employees of S&S who were members of MMP or whom MMP sought to recruit came within the statutory definition of "supervisors." The testimony was that MMP was "supposed to represent the deck officer personnel" and "the deck officers, as that term is commonly used on the river, includes the pilot, the master, and the two mates." The situation with respect to MEBA was less clear. There were three engineers on the Franklin D. Roosevelt and two on the Sandra Marie. The Franklin D. Roosevelt also had oilers; the Sandra Marie did not. The Board's general counsel did not dispute that two of the three engineers on the Franklin D. Roosevelt, the chief engineer and the relief chief engineer, were supervisors; but there was much argument whether the third should be so considered since he exercised supervisory duties only when neither the chief engineer nor the relief chief engineer was about. See N. L. R. B. v. Quincy Steel Casting Co., 1 Cir., 1952, 200 F.2d 293. The general counsel claimed that at least one of the engineers on the Sandra Marie could not have been a supervisor since he had no one to supervise. See General Foods Corporation, 110 N.L. R.B. 1088 (1954). MEBA disputed this, as well as the contention relating to the third engineer on the Franklin D. Roosevelt, claiming that these engineers were qualified and on these ships normally would have someone to supervise.
 
 
 16
 We do not believe the question whether MEBA and MMP are "labor organizations" that may be guilty of unfair labor practices should be decided by looking only at the workers of S&S. We think that the determination whether a labor union charged with an unfair labor practice under § 8(b) is a "labor organization" turns on whether "employees participate" in the organization charged and that, if they do, the union is a "labor organization" although all the workers of the particular employer whom it is seeking to represent are "supervisors" and therefore not "employees." This seems to us the natural meaning of the words, and that interpretation is reinforced by the provision of Section 2(3) that "The term `employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise * * *" To be sure, an attempt by a union to act on behalf of non-supervisory workers tends to show that the union is one in which "employees participate," but the fact that all the workers of the particular employer sought to be organized are supervisors has neither controlling nor even important evidentiary significance.
 
 
 17
 Of course, determination that a union is a "labor organization" because "employees participate" is only the beginning of the inquiry, not the end. For in the case of many practices spelled out in § 8 (b), it is necessary not only that "employees participate" in the organization charged but also that the conduct deal with "employees." Here there was no question that it did. For there was clear evidence that MEBA and MMP, as principals, induced "employees" of Standard to refuse to cross the picket line with the object of forcing Standard to cease to do business with S&S, and of forcing S&S to recognize the various unions participating in RJOC as representatives of "employees" of S&S despite lack of prior union certification.
 
 
 18
 There is no inconsistency in looking to the identity of the workers of the particular employer when the issue is whether an election must be held or who may vote in it, as petitioners correctly characterize the Board's practice, but to the entire composition of the union being charged, local or national, when the issue is whether it is a "labor organization" and therefore guilty of an unfair labor practice. The questions arise under different sections of the statute, with different wording and purpose. Questions of election arise under the Taft-Hartley amendment, embodied in 29 U.S.C.A. § 164, that no employer "shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining" — a provision designed to change the result reached in Packard Motor Car Co. v. N. L. R. B., 1947, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040, under the original Act. Plainly under § 164 the decisive factor is the identity of the employees sought to be organized or represented; it does not matter whether the union is composed solely of supervisors or of non-supervisors or contains both. The legislative history sheds little light on why Congress thought it a necessary corollary of § 164 that a union composed solely of supervisors should not be subject to § 8(b).[3] It may be, as contended by MEBA and MMP, that some members of Congress considered this in some way a quid pro quo. But the legislative history is far from being so definite or persuasive as to justify our reading the Act, in a manner opposed to its plain language, so as to permit a union in which "employees participate" to engage in acts branded as unfair labor practices by § 8(b) simply because the workers on whose behalf the union was acting are all supervisors.
 
 
 19
 Nothing to the contrary was decided in DiGiorgio Fruit Corp. v. N. L. R. B., supra. There it was the local that was held not to be a "labor organization" and it was undisputed that all members of the local were agricultural laborers who, like supervisors and railway workers, are excluded from the statutory definition of "employee." A. H. Bull Steamship Co. v. National Marine Engineers Beneficial Association, 2 Cir., 1957, 250 F.2d 332, arose in a different context and under a different section, 29 U.S.C.A. § 185(a), of the National Labor Relations Act; we are not willing to carry what was there said into the determination whether a union is a "labor organization" under § 8(b). Apparently the Board here took the same view that we do, although its opinion says little on the subject.
 
 
 20
 We turn now to the evidence as to the participation of "employees" in MEBA and MMP nationally. MEBA's constitution makes eligible for membership all "marine engineers" licensed by United States Government authorities and "marine engineers" regularly serving on commercial motor vessels operating in inland waters where governmental license requirements have not been established. In addition any engineer whose license is valid is eligible for membership "though he engage in another vocation." The Board argues with some force that this definition is so broad as necessarily to make persons who are not in fact engaged in supervisory duties eligible for membership. This argument is bolstered by the evidence with respect to the engineers on the Franklin D. Roosevelt and the Sandra Marie summarized above, and by the fact that MEBA's president was willing to go only so far as to say that "in most cases" when marine engineers are employed in the engine department, unlicensed personnel are also employed in the engine room. In addition, the Board cited that in 1955 MEBA had filed a petition to represent marine engineers employed by one particular employer on a motor vessel "excluding chief engineers, all other employees, guards, professional and supervisory employees as defined by the Act, as amended"; the inference that this shows that non-supervisory engineers participate in MEBA in a significant manner becomes somewhat less than shattering when examination of the petition discloses that the number of employees in question was two. Finally there was the admission in MEBA's answer in the Banta case.
 
 
 21
 MMP's constitution provides in Section 1(a) that the organization "shall be composed of personnel acting in an officer capacity aboard sail or power-propelled vessels," etc. Section 1(b) says that "The only exception to the above shall be as covered in Article XXV of this Constitution." Article XXV, entitled "Creating International Organization Masters, Mates and Pilots, Associated Maritime Workers Locals," states that "Eligibility to membership shall be any person employed in the maritime industry not working under the authority of a license." Taken literally, this would open membership broadly to "employees" in the statutory sense. The record sheds little light on the relationship of the "Associated Maritime Workers Locals" to the organization as a whole or on the membership of the associated locals. The lawyer for the union testified that when he was advising on the filing of non-Communist affidavits under 29 U.S.C.A. § 159(h), it had been "pointed out" to him that the associated locals "with the exception of possibly a hundred members out of almost a thousand, were composed of railroad employees" (who are excluded from the statutory definition) but the issue was not explored further. Beyond this there was the admission in the Banta answer and the filing by MMP of two representation petitions, one in 1952 for a unit of "deck hands, oilers, cooks, cabin boys and mates," and the other in 1954 for a unit of boat operators excluding office clerks, guards, professional employees and supervisors.
 
 
 22
 The question whether non-supervisory workers participate in MEBA and MMP would seem susceptible of determination on the basis of present facts rather than of union constitutional provisions and past filings on which the general counsel so largely relied. However, MEBA and MMP know who their members are and, if they do not know what their members do, certainly they can find out. The Board could properly have thought that the matters placed in the record by the general counsel justified an inference that non-supervisors do participate in MEBA and MMP, and that this sufficed for the Board's finding to that effect unless they were rebutted by more convincing evidence than the unions offered here. We therefore cannot say the Board's finding that MEBA and MMP were labor organizations did not meet the standards laid down in Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. We are not saying that MEBA and MMP are or are not in fact "labor organizations" within the meaning of § 8(b) today. We say only that we cannot hold, on the evidence in this record, that the Board was unjustified in finding that they were in April, 1957. We do not look with favor on the practice of determining such an issue by the citation of previous Board proceedings rather than by an investigation of the facts.[4] We earnestly suggest to the Board that the issue whether these two unions, whose activities concern almost every ocean and inland port of the United States, are "labor organizations" within the meaning of the National Labor Relations Act deserves more thorough treatment than it has had here. Such an investigation would not, of course, have to be performed in every case. Once the Board determined on the basis of a full inquiry that MEBA and MMP were or were not labor organizations, the Board could rely on this unless there was evidence of a change. We fear that until that is done, the issue will be relitigated in every § 8 (b) case against these unions as well as in every case involving them that comes before the courts under 29 U.S.C.A. § 160(l),[5] with consequent waste of administrative and judicial time and possible unfairness to the parties and the public.
 
 
 23
 Petition for enforcement granted; petitions for review denied.
 
 
 
 Notes:
 
 
 [1]
 Section 2
 (5) "The term `labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."
 (3) "The term `employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, * * * but shall not include * * * any individual employed as a supervisor * * * or any individual employed by an employer subject to chapter 8 of Title 45."
 (11) "The term `supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."
 
 
 [2]
 Enforcement was denied, on grounds not pertinent here. N. L. R. B. v. National Organization Masters, Mates and Pilots, 7 Cir., 1958, 253 F.2d 66
 
 
 [3]
 No exception for unions composed solely of supervisors is provided in the Labor Management Reporting and Disclosure Act of 1959, Public Law No. 86-257, 73 Stat. 519, 29 U.S.C.A. § 401 et seq
 
 
 [4]
 At the argument counsel for the Board handed up to us a decision of the Board dated November 12, 1959, in International Organization of Masters, Mates and Pilots, et al., Case No. 13-CC-168. There the Board again confirmed a report of a trial examiner finding MMP to be a labor organization. The relevant section of his report contains even fewer facts than here — we find again MMP's constitution, the admission in Banta, the two representation petitions referred to in our opinion, and, as the crown of the structure, the Board's decision in the instant case
 
 
 [5]
 The question in such cases is whether the Board had "reasonable cause to believe" that the unions were labor organizations. See Madden v. International Organization of Masters, Mates and Pilots, 7 Cir., 1958, 259 F.2d 312, certiorari denied 358 U.S. 909, 79 S.Ct. 236, 3 L.Ed.2d 229; Douds v. Seafarers' International Union, D.C.E.D.N.Y.1957, 148 F.Supp. 953; Penello v. Seafarers' International Union, E. D. Va. April 4, 1957, 40 L.R.R.M. 2180