539 F.2d 554
 93 L.R.R.M. (BNA) 2429, 79 Lab.Cas. P 11,639
 INTERNATIONAL ORGANIZATION OF MASTERS, MATES AND PILOTS,
MARINE DIVISION, INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION, AFL-CIO, Petitioner-Cross Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.
 No. 75-2820.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 27, 1976.
 
 Victor H. Hess, Jr., New Orleans, La., Marvin Schwartz, New York City, Jerry D. Anker, Washington, D. C., Seymour Waldman, New York City, for petitioner-cross respondent.
 Elliott Moore, Deputy Assoc. Gen. Counsel, Roger T. Brice, N.L.R.B., Washington, D. C., for respondent-cross petitioner.
 Chas. M. Paschal, Jr., Regional Director, Region 15, New Orleans, La., for other interested parties.
 Albert H. Hanemann, Jr., New Orleans, La., for Westchester, California & Hawaiian and Pyramid.
 Richard H. Markowitz, New York City, for District Nos. 1 & 2.
 Jean C. Gaskill, Donald D. Connors, Jr., San Francisco, Cal., for intervenors.
 Petition for Review and Cross Application for Enforcement of an Order of the National Labor Relations Board (Louisiana Case).
 Before THORNBERRY* and AINSWORTH, Circuit Judges, and HOFFMAN,** District Judge.
 AINSWORTH, Circuit Judge:
 
 
 1
 Section 8(b)(1)(B) of the National Labor Relations Act provides that "(i)t shall be an unfair labor practice for a labor organization or its agents . . . to restrain or coerce . . . an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances." See 29 U.S.C. § 158(b)(1)(B). The National Labor Relations Board determined that petitioner International Organization of Masters, Mates and Pilots, Marine Division, International Longshoremen's Association, AFL-CIO (hereinafter "MM&P") violated section 8(b)(1)(B) by picketing two United States merchant vessels, the Ultramar and the Sugar Islander, whose licensed deck officers are represented by a rival union, Marine Engineers Beneficial Association (hereinafter "MEBA"). MM&P petitioned this court to review and reverse the Board's order, the Board cross-petitioned for enforcement, and the vessels' operators and MEBA intervened on behalf of the Board. See 29 U.S.C. §§ 160(e), 160(f); Fed.R.App.P. 15(d). We enforce the order.
 
 I.
 
 2
 Petitioner MM&P is the principal labor union representing the licensed deck officers who serve in the United States Merchant Marine. Licensed deck officers on large merchant vessels, such as the Ultramar and the Sugar Islander, are "supervisors" within the meaning of the Act, see 29 U.S.C. § 152(11), as one of their duties, among others, is the adjustment of grievances that arise on shipboard. Thus, they are also "representatives" for the purposes of section 8(b)(1)(B). But MM&P represents, in addition to the licensed deck officers, a small contingent of unlicensed "employee" members.[1] See 29 U.S.C. § 152(3). By reason of its representation of these "employee" members, MM&P is considered by the Board to be a "labor organization" as defined in section 2(5) of the Act. See 29 U.S.C. § 152(5); International Organization of Masters, Mates and Pilots v. NLRB, 122 U.S.App.D.C. 74, 351 F.2d 771, 777 (1965). It thus enjoys the protections embodied in section 8(a) of the Act and, similarly, suffers the restrictions imposed by section 8(b) on its organizational and other activities. See 29 U.S.C. §§ 158(a), 158(b).
 
 
 3
 Since the late 1950's, MM&P has been engaged in a burgeoning jurisdictional dispute with MEBA over the right to represent licensed deck officers manning United States merchant vessels. Representation of the licensed deck officers who will serve upon a particular vessel by either MM&P or MEBA, as the case may be, is determined when the vessel's operators execute a contract with the union of their choice at or near the time when construction of the vessel is completed. The competition between the two unions has heightened since 1970 because of renewed shipbuilding activity fostered in principal part by a federal subsidy program. Because its contract is more favorable to vessel operators in many respects than the standard MM&P contract, MEBA holds a substantial competitive advantage in the fight to represent licensed deck officers on the newest generation of United States merchant vessels. MM&P's contract, for example, requires manning by a master and four mates; the MEBA contract, by contrast, only requires manning by a master and three mates. Additionally, there is a wage differential favoring the MEBA contract, and an alliance between MEBA and the Seafarers International Union, which represents unlicensed personnel, has worked in the past as an inducement for vessel operators to accept the MEBA contract.
 
 
 4
 The Ultramar, the first American flag ship capable of carrying oil, bulk cargo, and ore, is owned by CIT Corporation and bareboat chartered to Aries Marine Shipping Company. Aries entered into a crew husbanding agreement with Westchester Marine Shipping Company, under the terms of which Westchester supplies crews for the Ultramar. Westchester is in turn a party to a collective bargaining agreement with District No. 1-Pacific Coast Division, MEBA, AFL-CIO. The collective bargaining agreement between MEBA and Westchester covers licensed deck officers and engine officers aboard the Ultramar and embodies the advantages of the standard MEBA contract, including the provision for manning by a master and three mates. In 1971, shortly after construction of the Ultramar had begun, the President of MM&P received assurances from Aries that MM&P would provide representation for the licensed deck officers on the Ultramar. Two years later, however, when construction was almost completed, the Westchester crew husbanding contract was executed, and MEBA was designated as the representative of licensed deck officers on the Ultramar. In response to inquiries from MM&P, Aries took the position that Westchester was responsible for manning the Ultramar and that the proper forum to resolve the dispute between MM&P and MEBA was the AFL-CIO, the parent organization to which both MM&P and MEBA belong. In November, 1973, members of MM&P picketed the Ultramar, which was at that time in Destrehan, Louisiana. The picketers carried signs stating:
 
 S. S. ULTRAMAR
 Works its Deck Officers Under
 LOWER STANDARDS
 
 5
 than those worked under
 
 
 6
 by Deck Officers
 
 REPRESENTED BY
 MASTERS, MATES AND
 PILOTS
 MARINE DIVISION OF THE
 INTERNATIONAL LONGSHOREMAN'S
 ASSOCIATION
 AFL-CIO
 
 7
 The second vessel picketed by MM&P, the Sugar Islander, is owned by Bankers Trust Company and time chartered to Californian & Hawaiian Sugar Company. It is the first American flag ship with a completely automated, unattended engine room. Pyramid Sugar Transport, Inc., holds the bareboat charter for the vessel and is a party to a collective bargaining agreement with District 2, Marine Engineers Beneficial Association, Associated Maritime Officers, AFL-CIO, which provides representation for the Sugar Islander's licensed deck officers. MEBA's ally, the Seafarers International Union, represents the unlicensed personnel serving on the Sugar Islander. As was its experience with Westchester, MM&P was unsuccessful in its attempts to persuade Pyramid to enter a collective bargaining agreement naming MM&P as the labor representative for the licensed deck officers aboard the Sugar Islander. In late September, 1973, approximately one month after construction of the vessel was completed, MM&P members picketed the Sugar Islander in New Orleans with signs stating:M/V SUGAR ISLANDER
 
 UNFAIR TO THE
 MASTERS, MATES AND PILOTS
 MARINE DIVISION OF THE
 INTERNATIONAL LONGSHOREMAN'S
 ASSOCIATION, AFL-CIO
 
 8
 Three months later, in January, 1974, the Sugar Islander was picketed again, while docked at a sugar refinery in Reserve, Louisiana. The picket signs carried this time stated:
 
 M/V SUGAR ISLANDER
 Works Its Deck Officers Under
 LOWER STANDARDS
 
 9
 than those worked under
 
 
 10
 by Deck Officers
 
 REPRESENTED BY
 MASTERS, MATES & PILOTS
 MARINE DIVISION OF THE
 INTERNATIONAL LONGSHOREMAN'S
 ASSOCIATION
 AFL-CIO
 
 11
 MM&P members picketed the Sugar Islander with similar signs on two more occasions in January, at Burnside, Louisiana, and at Mobile, Alabama.
 
 
 12
 Pyramid and C&H Sugar Company each filed unfair labor practice charges against MM&P with the Board in early January, 1974. At approximately the same time and as a result of the picketing of the Ultramar, Westchester also filed unfair labor practice charges. A consolidated unfair labor practice complaint issued against MM&P on February 1, 1974, and a hearing was held before an Administrative Law Judge ("ALJ"). Relying on the decision of the Board and the D.C. Circuit in International Organization of Masters, Mates and Pilots (Marine and Marketing International Corp.), 197 NLRB 400 (1972), enforced, 159 U.S.App.D.C. 11, 486 F.2d 1271 (1973), cert. denied, 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 306 (1974), the ALJ concluded that the picketing of the Ultramar and the Sugar Islander fell within the literal prohibition of section 8(b)(1)(B), insofar as one object of the picketing was to force replacement of the MEBA-represented licensed deck officers with others represented by MM&P. The ALJ did not consider the extent to which other objects of the picketing were proscribed by the statute, but he did identify three other objects of MM& P's picketing: MM&P also sought (1) recognition as the sole bargaining representative for the licensed deck officers aboard the Ultramar and the Sugar Islander, (2) a collective bargaining agreement covering the licensed deck officers on the two vessels, and (3) application of the wages, terms, and conditions of employment specified in the standard MM&P contract to the licensed deck officers on the Ultramar and the Sugar Islander.
 
 
 13
 As the ALJ had done, the Board found that MM&P's picketing of the Ultramar and the Sugar Islander violated section 8(b)(1)(B) and ordered the union to cease and desist from picketing the two vessels and from "in any manner restraining or coercing (Westchester and Pyramid) in the selection of their representatives for the purpose of the adjustment of grievances." Appendix at 6-7. MM&P was ordered to cease and desist from picketing "for the objects of forcing (Westchester and Pyramid) to recognize (MM&P) as the collective bargaining representative of (Westchester's and Pyramid's) licensed deck officers and/or to force the (employers) to enter a collective bargaining agreement with (MM&P) setting the terms and conditions of their employment". It was determined also that picketing to compel adherence to the labor standards established by MM&P violated section 8(b)(1)(B). Appendix at 2-5. The Board thus reached the issue, unaddressed by the ALJ, of the legality under section 8(b)(1)(B) of MM&P's picketing for the three objects other than replacement of the licensed deck officers on the two vessels by MM&P members.
 
 II.
 
 14
 By virtue of a constitutional revision adopted in 1970, MM&P is divided into three divisions the Inland Division, the Pilots Division, and the Offshore Division. Each division operates under its own bylaws adopted by its own membership, has its own officers' positions, treasury, and dues, and files separate disclosure reports with the Department of Labor. The Offshore Division, whose membership is restricted to licensed deck officers on large ocean-going vessels, also has its own negotiating committee, which formulates contract proposals, handles negotiations, and calls strikes. The Offshore Division is thus, at least in terms of its formal relationship with MM&P, a relatively autonomous organization.
 
 
 15
 The actual picketing of the Ultramar and the Sugar Islander was conducted by members of the Offshore Division, and no members of any other MM&P division participated. MM&P argued before the ALJ and the Board, and argues before this court, that the Offshore Division alone was responsible for the picketing of the Ultramar and the Sugar Islander, that membership in the Offshore Division is limited to "supervisors", and that the Offshore Division is thus not a "labor organization" subject to the prohibitions of section 8(b)(1)(B).
 
 
 16
 In reviewing the Board's factual determination that MM&P was responsible for the picketing of the two vessels, we are bound to accept that determination if it is supported by substantial evidence on the record considered as a whole. See 29 U.S.C. § 160(e); NLRB v. Unoco Apparel, Inc., 508 F.2d 1368, 1370 (5 Cir. 1975); NLRB v. Mueller Brass Co., 501 F.2d 680, 683 (5 Cir. 1974). Though, as noted above, the actual picketing was conducted by members of the Offshore Division, the evidence relied on by the ALJ and the Board established that the decision to picket was made by MM&P acting through its senior officers. The president, executive vice-president, and secretary-treasurer of MM&P are simultaneously the executive officer, the assistant executive officer, and the financial officer of the Offshore Division. MM&P President O'Callaghan, who was also the executive officer of the Offshore Division, directly ordered the picketing of the Ultramar and the Sugar Islander after notification of the decision to ILA President Thomas Gleason. As did the Board, we reject the notion that a workable distinction can be made between acting in one's capacity as an officer of the Offshore Division and acting in one's capacity as an officer of MM&P, see Selby-Battersby & Co. v. NLRB, 259 F.2d 151, 156-57 (4 Cir. 1958), particularly when the record reveals, as it does here, a longstanding and bitter dispute between the parent organization and its rival for representation. See National Marine Engineers Beneficial Association v. NLRB, 274 F.2d 167 (2 Cir. 1960). We are satisfied that the Board's assignment of culpability for the picketing to MM&P was supported by substantial evidence.
 
 III.
 
 17
 Insofar as its object was replacement of the MEBA-represented deck officers with its own members, the picketing of the Ultramar and the Sugar Islander by MM&P was, without question, within the literal language of section 8(b)(1)(B). MM&P argues, however, that the statute was never intended by Congress to reach picketing that promotes or protects only the interests of those MM&P members who are "supervisors" within the meaning of the Act. When picketing is directed not to the manner in which the grievance adjusting function is performed by supervisory personnel, but to the more traditional labor concerns of wages, terms, and conditions of employment for those supervisory personnel, section 8(b)(1)(B), it is argued, should have no application.
 
 
 18
 MM&P's argument was rejected explicitly, on what we regard as solid reasoning, by the majority of a panel of the D. C. Circuit in a case presenting squarely the issue of section 8(b)(1)(B)'s applicability when the object of picketing is replacement of supervisory personnel. See International Organization of Masters, Mates and Pilots v. NLRB (Marine & Marketing), 159 U.S.App.D.C. 11, 486 F.2d 1271 (1973), cert. denied, 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 306 (1974). A union, if composed solely of supervisory personnel, is not a "labor organization" as defined in the Act and thus is not limited in its organizational and other activities by section 8(b). On identical reasoning, a union of supervisors is not protected by section 8(a)'s restraints on employer action. The legislative history of the Labor Management Relations Act, consistent with the above, suggests a congressional desire to leave supervisors to their economic weapons. Marine & Marketing, supra at 1273; see 1 Legislative History of the Labor Management Relations Act, 1947, 613 (1948); A. Cox, Some Aspects of the Labor Management Relations Act, 1947, 61 Harv.L.Rev. 1, 4-5 (1947). But MM&P is not, of course, a supervisors' union. By virtue of its "employee" members, MM&P is a "labor organization" protected by section 8(a) and restrained by section 8(b). MM&P's argument, if allowed to prevail, would destroy the symmetry of protection and restraint embodied in sections 8(a) and 8(b): MM&P would be protected by section 8(a), but uninhibited in its actions by section 8(b). As was the experience of the court in Marine & Marketing, we are unable to locate support in the legislative history for MM& P's novel reading of the statute. See National Marine Engineers Beneficial Association v. NLRB, 274 F.2d 167, 173 (2 Cir. 1960).
 
 
 19
 Implicit in section 8(b)(1)(B) is the congressional judgment, which surfaces explicitly in another section of the Act, see 29 U.S.C. § 164(a), that relations between an employer and its supervisory personnel should be insulated in full measure from coercive efforts by a labor union. Thus, a union violates section 8(b)(1)(B) if it strikes to force an employer to hire only union members as foremen, see International Typographical Union Local 28 v. NLRB, 278 F.2d 6 (1 Cir. 1960), aff'd by an equally divided Court,365 U.S. 705, 81 S.Ct. 855, 6 L.Ed.2d 36 (1961), and the employer may demand with impunity that supervisory personnel neither retain their union membership nor participate in any way in union affairs. See Beasley v. Food Fair of North Carolina, 416 U.S. 653, 661-62, 94 S.Ct. 2023, 40 L.Ed.2d 443 (1974). A crucial feature of the employer's prerogative to demand the complete loyalty of its supervisory personnel is the concomitant right to designate as its representatives for the adjustment of grievances those persons whom it pleases. Indeed, the employer's section 8(b)(1)(B) decision can be based, permissibly, on reasons completely divorced from the grievance adjusting abilities of the different contenders for supervisory positions. The employers in the instant case, Westchester and Pyramid, were free to designate MEBA as the representative for licensed deck officers on the Ultramar and the Sugar Islander in the belief that the MEBA contract, with its reduced manning requirement and other features, was more economical than the standard MM&P contract and reflected an understanding by the MEBA hierarchy of the precarious competitive position of the United States Merchant Marine. Notwithstanding the difficulties involved in a post hoc reconstruction of the employer's reasons for selecting a particular representative, see Marine & Marketing, supra at 1275, section 8(b) (1)(B) secures to the employer the unfettered right to select supervisory personnel, and its grounds for selection are not subject to challenge in defense of a charged violation of that provision.
 
 
 20
 We do not read the Supreme Court's decision in Florida Power & Light Co. v. International Brotherhood of Electrical Workers, 417 U.S. 790, 94 S.Ct. 2737, 41 L.Ed.2d 477 (1974), as impugning either the reasoning of the D. C. Circuit in Marine & Marketing or the result that we reach here. In Florida Power & Light the union disciplined supervisory members who crossed a picket line and performed struck work. The Board found that the union violated section 8(b)(1) (B), but the court of appeals denied the Board's petition for enforcement. The Supreme Court affirmed the denial of the Board's petition, holding that
 
 
 21
 (t)he conclusion is thus inescapable that a union's discipline of one of its members who is a supervisory employee can constitute a violation of § 8(b)(1) (B) only when (the) discipline may adversely affect the supervisor's conduct in performing the duties of, and acting in his capacity as, grievance adjuster or collective bargainer on behalf of the employer.
 
 
 22
 416 U.S. at 804-805, 94 S.Ct. at 2744.
 
 
 23
 The factual differences between the union's conduct in Florida Power & Light and the picketing of the Ultramar and the Sugar Islander are manifest. In Florida Power & Light the employer took the position that the supervisory personnel who were also members of the union were free to decide on an individual basis whether or not they would cross the picket line. 416 U.S. at 739, 94 S.Ct. 2737. Given that the statute speaks to coercion of the employer, sustaining the Board's determination in Florida Power & Light would have been difficult in light of the employer's attitude. Westchester and Pyramid, in contrast, made positive decisions to have MEBA represent the licensed deck officers on the two vessels, and there can really be no question about the coercive effect of MM&P's picketing. And, of course, the union coercion in the instant case was directed at the employers, Westchester and Pyramid, themselves; the disciplinary proceedings in Florida Power & Light amounted to indirect coercion of the employer at best. When the union coercion called into question is applied directly to the employer, the Board is correct in enforcing the statute to its literal limit, which clearly encompasses picketing for replacement purposes.
 
 IV.
 
 24
 The ALJ found it unnecessary to consider the legality of MM&P's picketing for objects other than replacement of the licensed deck officers on the Ultramar and the Sugar Islander. Advancing substantially beyond the ALJ's decision, however, the Board concluded that all objects of MM&P's picketing of the two vessels were prohibited by section 8(b)(1)(B). The Board argues that if MM&P were successful in attaining those objects other than replacement recognition, a collective bargaining agreement, and adherence to MM&P labor standards then the class of individuals from which Westchester and Pyramid could select representatives for the adjustment of grievances would be restricted unnecessarily. Thus, the practical effect of seeking these other objects is, the Board contends, tantamount to coercion of the employers in the selection of their licensed deck officers. We agree.
 
 
 25
 For Westchester and Pyramid to have met MM&P labor standards, particularly the manning requirement in the standard MM&P contract, would have necessitated a breach of the then-effective collective bargaining contract between the employers and MEBA. Recognition of MM&P by the employers and execution of an appropriate collective bargaining agreement between those employers and MM&P would similarly have forced a breach of the existing contract. The Board asserts that MM&P's attainment of any or all of the sought-after objectives of its picketing would have compelled MEBA to forbid its members from serving on the Ultramar or the Sugar Islander, and we have no difficulty accepting this assertion. Maintaining its competitive edge in the fight to represent licensed deck officers on ocean-going vessels turns largely on the ability of MEBA to offer employers an economical contract, which will in turn permit effective competition between United States and foreign flag vessels. Consequently, even if the only objective in fact attained were adherence to MM&P labor standards, the threat to MEBA would still be clear. The threat to MEBA raised by recognition and a collective bargaining agreement between the employers and MM& P is, of course, even more substantial. The probable and foreseeable result of MM&P's picketing for any or all the objects discussed above would be, we feel, unnecessary restriction of the class of individuals available as licensed deck officers to members of MM&P and no others. Picketing for each of these objects violated section 8(b)(1)(B).
 
 
 26
 We perceive no barrier raised by Florida Power & Light to the result that we reach in this section of our opinion. Florida Power & Light was, as we emphasized above, a decision addressed to the problem of indirect coercion of the employer. Where the facts as determined by the Board disclose a case of direct coercion, and they do here, the sweep of the statute is broad enough to prohibit picketing for replacement, recognition, a collective bargaining agreement, or adherence to labor standards. See NLRB v. Sheet Metal Workers International Association, 199 NLRB 166 (1972), enforced, 502 F.2d 1159 (1 Cir. 1973), cert. denied, 416 U.S. 904, 94 S.Ct. 1608, 40 L.Ed.2d 109 (1974).
 
 
 27
 The petition for review is DENIED, and the cross-petition for enforcement is GRANTED.
 
 
 
 *
 THORNBERRY, Circuit Judge, was a member of the panel that heard oral arguments but due to illness did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46(d)
 
 
 **
 District Judge of the Eastern District of Virginia, sitting by designation
 
 
 [1]
 MM&P has approximately 200 to 250 unlicensed "employee" members. By contrast, MM&P represents nearly 6,000 licensed deck officers. The "employee" members are for the most part deckhands and cooks on tugboats, ferries, and other small vessels that are organized on a "top to bottom" basis